[No. D046696. Fourth Dist., Div. One. Feb. 28, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
DESHAWN ALVIN MAYS, Defendant and Appellant.

COUNSEL

Michelle C. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch and James D. Dutton, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McCONNELL, P. J.—Deshawn Alvin Mays[1] was convicted by a jury of pimping (Pen. Code, § 266h, subd. (a)) and eight counts of money laundering (*id.*, § 186.10, subd. (a)). He was sentenced to a total term of four years eight months, which included an eight-month term for violating probation in another case.

On appeal, Mayo contends the money laundering counts must be reversed because there is insufficient evidence to show each count involved at least a $5,000 transactional amount derived from or intended to promote criminal activity, the money laundering statute is unconstitutionally vague, and the court failed to properly instruct the jury on all the elements of money laundering. We affirm the judgment.

FACTS

*The Escort Service*

Mayo ran an escort service, Exotic Secrets. The escort service charged $150 to $300 for a one-hour "private dance." Six or seven out of every 10 customers requested sexual services. The fees for the sexual services ranged from $50 to $1,500, depending on the services provided. The core group of women gave all their earnings to Mayo, including fees from sexual services, and he paid for all their living expenses, including rent, food, and cell phones used in the escort/prostitution business. Mayo provided a house for the women on Ewing Drive.

A San Diego police detective testified about the typical differences between street and escort prostitution. Street prostitutes usually have a pimp who

---

[1] For clarity we refer to defendant's alias Allmighty Supreme Mayo (Mayo), the name most frequently referred to at trial.

provides the prostitutes with a hotel room and sometimes food and money for condoms, and in return the prostitutes give the pimp all the money they earn. In contrast, a person running an escort business typically builds a wall between himself and his escort prostitutes to make it appear they are independently engaging in prostitution. Escort prostitutes generally charge more money for sexual acts and less frequently have a pimp.

Typically, street prostitutes recruit other prostitutes for their pimp; this does not typically occur in escort prostitution. The women working for Mayo recruited other escort prostitutes. Escort prostitutes infrequently have sex with the person running the business, while street prostitutes often have sex with their pimps. Mayo regularly had sex with the women who worked for him. While street prostitutes have tattoos reflecting their pimp, this is not usually seen with escort prostitutes. Several of Mayo's escort prostitutes had tattoos of the logo for Mayo's business, Supreme Entertainment, on their lower backs and one woman was told if she stayed long enough and proved she was "down" enough, she could earn a tattoo like the other women.

### Office and Other Rentals

Mayo, doing business as Supreme Entertainment, rented connected suites 207 and 209 on Palm Street for 24 months beginning in April 2001. One suite was the office of Exotic Secrets. The other suite housed a music studio for Supreme Entertainment, which was assertedly in the business of making records, however, there was no evidence this business ever produced any albums or compact discs.[2] In July 2003, Mayo moved from suites 207 and 209 to suite 108 in the same building. In September, his sister, who had been handling calls at Exotic Secrets, nominally rented suite 205 in the Palm Street building for the business "Southwest Referral," but Mayo paid the rent and obtained a reduction in the rent from the landlord for this suite. The sister told the landlord her business was "like finding business for people."

In February 2002, Mayo and one of the women working at his escort business presented themselves as husband and wife in order to rent a residence on Fairway Court. Mayo's mother, two of his brothers, and other relatives lived there and at another residence on Steiner Drive rented by Mayo and the escort prostitute posing as his wife.

---

[2] Mayo testified that he rented his music studio, sold music compact discs and ghostwrote songs, but on appeal we view the evidence in the light most favorable to the judgment; other evidence showed Mayo's music business did not produce any compact discs or income.

*Bank Accounts*

Mayo had a number of bank accounts, including one at Washington Mutual in his own name, a Union Bank account in the name of Supreme Entertainment and a Humboldt Merchant Bank account originally in the name of Supreme Entertainment doing business as A.M.S. Services that was later changed to Southwest Referral. When credit card charges were made for escort services, the payments were made to the Humboldt Merchant Bank account, which held the money for a day or two before transferring the funds to the Southwest Referral account. Additionally, Mayo's sister, doing business as Southwest Referral, had a Union Bank account.

*Money Laundering Charges*

Mayo was convicted of eight counts of money laundering occurring between the end of May 2002 and early July 2003. Each count involved a cash deposit or two cash deposits into, and checks written from, a checking account within a 10-day period. At the time the deposits were made, the balances in the accounts were at most a few hundred dollars. Within 10 days of the deposits, Mayo wrote checks (or checks cleared), inter alia, for the rent on the Palm Street offices, rent on the Ewing Drive residence and payment of phone bills.

*Count 3—Deposits Totaling $8,300*

Between May 30 and June 3, 2002, Mayo made cash deposits totaling $8,300 into his Washington Mutual account. At the time of the May 30 deposit, the balance in the account was a negative $290. Within 10 days, he wrote checks totaling nearly $3,600 to cover rent for suites 207 and 209 on Palm Street and the Ewing Drive residence.

*Counts 4 and 5*
*Deposit of $9,000 and Deposit of $5,650*

On June 28, 2002, a $9,000 cash deposit was made to Mayo's Washington Mutual account. Prior to the deposit, the balance in the account was $379. On July 8, 2002, a $5,650 cash deposit was made to the Washington Mutual account. Between July 5 and July 8, checks totaling over $5,800 cleared the account covering the rent for the Ewing Drive residence and suites 207 and 209 on Palm Street and the cell phone bill.

*Count 6—Deposit of $5,650*

On October 28, 2002, Mayo deposited $5,650 in cash into his Supreme Entertainment account at Union Bank. At the time of the deposit, the account

had a balance of $262.27. Mayo wrote checks from this account totaling $5,645 to cover the rent for suites 207 and 209 on Palm Street and the cell phone bill.

### Count 7—Deposit of $5,430

On February 3, 2003, Mayo made a cash deposit of $5,430 into his Washington Mutual bank account. At the time of the deposit, the balance in the account was $60.34. On February 6, 2003, Mayo's check for $2,350 for rent on the Ewing Drive residence cleared the account.

### Count 8—Deposit of $5,500

On March 4, 2003, Mayo made a cash deposit of $5,500 into his Washington Mutual account. By March 10, Mayo's checks totaling $4,445 for the rent on the Ewing Drive and the Fairway Court residences had cleared the account.

### Count 9—Deposits Totaling $7,200

Between April 30 and May 6, 2003, Mayo made two deposits into his Washington Mutual account totaling $7,200. Prior to the first deposit, the balance in the account was $287. Between May 1 and May 9, checks totaling $7,250 cleared the account—one for rent on the Ewing Drive residence, and the other payable to Albert Slott with a memo on the check noting "rent + deposit."

### Count 10—Deposit of $8,000

On July 3, 2003, Mayo made an $8,000 cash deposit into his Supreme Entertainment account at Union Bank. At the time he made the deposit, the balance was $718. From this deposit, Mayo wrote checks totaling $5,903.99 to cover the rent on the Ewing Drive residence and the cell phone bill.

## DISCUSSION

### I

### *Money Laundering*

Mayo was convicted of money laundering as provided in Penal Code section 186.10, subdivision (a).[3] He contends the People must prove the entire minimum transactional amount of $5,000 laundered through a financial institution was related to criminal activity. Mayo also contends the statute is unconstitutionally vague.

### (A)  *California's Money Laundering Offense*

■   Penal Code section 186.10, subdivision (a), California's money laundering statute, in pertinent part, provides: "(a) Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000), . . . through one or more financial institutions (1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering. . . ." A transaction includes a deposit into or withdrawal from a financial institution. (Pen. Code, § 186.9, subd. (c).)

Enacted in 1986, this and related legislation was prompted by the growth of money laundering associated with drug trafficking in California, which had occurred, in part, due to federal investigations of Florida banks and Florida's enactment of a cash transaction reporting requirement for financial institutions. (Stats. 1986, ch. 1039, § 2, p. 3606; Pen. Code, §§ 186.9, 186.10, 14160–14167.) Money laundering was not a crime under existing federal or state laws, but could only be prosecuted as a violation under the federal Bank Secrecy Act of 1970 (31 U.S.C. § 5311 et seq.), which required financial institutions to report cash transactions exceeding $10,000 to the federal department of justice. (Assem. Com. on Pub. Safety, Rep. on Sen. Bill No. 1470 (1985–1986 Reg. Sess.) as amended Mar. 6, 1986.) Supporters urged passage of the money laundering laws, describing them as making it a crime to use a financial institution in the State of California to promote criminal activity or to transact proceeds derived from a crime. (*Ibid.*)

---

[3] At the parties' request, we take judicial notice of the legislative history of Penal Code section 186.10.

No published California case has interpreted Penal Code section 186.10. Both Mayo and the Attorney General rely on federal cases to support their interpretations of California's money laundering statute.

### (B) *Federal Money Laundering Offenses*

The federal money laundering statutes, like the California statute, were enacted in 1986 in response to the war on drugs. (Money Laundering Control Act of 1986, Pub. L. No. 99-570 (Oct. 27, 1986) 100 Stat. 3207-18, codified in part as amended at 18 U.S.C. §§ 1956–1957); see *U.S. v. Rutgard* (9th Cir. 1997) 116 F.3d 1270, 1291 (*Rutgard*).) Federal law has two statutes criminalizing money laundering: title 18 United States Code section 1956 (section 1956) and title 18 United States Code section 1957 (section 1957).

### (1) *Section 1956*

"Section 1956 is the basic, and most frequently used, money laundering statute. It contains three subsections which criminalize three types of criminal activity: [section] 1956(a)(1) covers domestic financial transactions; subsection (a)(2) deals with international money laundering; and subsection (a)(3) was drafted to include government sting operations." (Miller, *Federal Money Laundering Crimes—Should Direct Tracing of Funds Be Required?* (2001) 90 Ky. L.J. 441, 443, fns. omitted (Miller).) Section 1956, in pertinent part, states: "(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—[¶] (A)(i) with the intent to promote the carrying on of specified unlawful activity; or [¶] (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986 [26 U.S.C. § 7201 or 7206]; or [¶] (B) knowing that the transaction is designed in whole or in part—[¶] (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or [¶] (ii) to avoid a transaction reporting requirement . . ." is subject to specified fines and/or imprisonment.

"[T]he term 'knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity' means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law . . . ." (§ 1956(c)(1).) "[T]he term 'transaction' . . . with respect to a financial institution includes a deposit, [or] withdrawal . . . ." (§ 1956(c)(3).) " '[M]onetary instruments' "

include "coin or currency of the United States or of any other country" as well as a personal checks. (§ 1956(c)(5).)

"Offenses under [section] 1956(a)(1) are commonly known as 'transaction money laundering' offenses because the prohibited act is the financial transaction itself." (McGuinn, *Money Laundering* (2006) 43 Am. Crim. L.Rev. 739, 743 (McGuinn).)

In sum, section 1956 is violated when a person: (1) knowingly conducts a financial transaction, (2) the proceeds involved in the transaction are from a specified unlawful activity, and (3) the individual has the requisite mens rea. The requisite mens rea requirement is met by showing the defendant had the intent (a) to promote the carrying on of a specified unlawful activity or (b) to violate the Internal Revenue Code and knew the transaction was designed to conceal the illegal source of the money, or avoid a transaction reporting requirement.

### (2)  *Section 1957*

Section 1957 punishes a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." (§ 1957(a).) A "monetary transaction" includes a deposit or withdrawal. (§ 1957(f)(1).) " '[C]riminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense." (§ 1957(f)(2).)

"Because the recipient need not actually exchange or launder the funds or have any specific intent to further or conceal unlawful activity, [section] 1957 potentially criminalizes seemingly 'innocent' acts or commercial transactions. In enacting [section] 1957, Congress intended to dissuade people from engaging in even ordinary commercial transactions with people suspected to be involved in criminal activity. However, [section] 1957 does require that the violator 'knowingly' engage in a transaction involving criminally derived property." (McGuinn, *supra,* 43 Am. Crim. L.Rev., at p. 745, fns. omitted.)

### (3)  *Tracing When Funds from Legal and Illegal Sources*<br>*Are Commingled*

Due to differences in the federal statutes, some courts impose different tracing requirements for the statutes when funds from illegal and legal sources are commingled in a bank account or in other property.

"Section 1957 differs from section 1956 in two critical respects: It requires that the property have a value greater than $10,000, but it does not require

that the defendant know of a design to conceal aspects of the transaction or that anyone have such a design. Due to the omission of a 'design to conceal' element, section 1957 prohibits a wider range of activity than money 'laundering,' as traditionally understood." (*U.S. v. Allen* (10th Cir. 1997) 129 F.3d 1159, 1165.)

While these differences in the statutes have led courts to somewhat different approaches to tracing funds to an illegal source when legal and illegal funds are commingled in a single account, the federal courts do not require a precise correlation between cash obtained from an illegal source, for example, the tracing of a specific dollar bill and transfers into and out of a financial institution. Regardless of the differences in the statutory require-ments, the federal courts recognize that money is fungible. (See, e.g., *U.S. v. Abbell* (11th Cir. 2001) 271 F.3d 1286, 1296, fn. 5 [section 1956 prosecu-tion]; *U.S. v. Moore* (4th Cir. 1994) 27 F.3d 969, 976 [section 1957 prosecution]; but note *Rutgard, supra,* 116 F.3d 1270, 1292 [fungibility of money does not itself justify lack of any tracing requirement in section 1957 prosecution].)

### (a)   *Section 1956 Tracing Requirements*

In section 1956 prosecutions, the "[c]ourts have looked to the 'involve' language in the statute[4] and the broad remedial intent of the money laundering statute to hold that requiring direct tracing is contrary to the statutory language and would allow criminals to avoid conviction by com-mingling dirty money in accounts with other funds. Commingling itself has been held to be indicative of intent to launder funds. No circuit has required the government to directly trace proceeds to specified unlawful activity in a [section] 1956 case." (Miller, *supra,* 90 Ky. L.J. 441, 448, fns. omitted; see also Johnson, *The Criminally Derived Property Statute: Constitutional and Interpretive Issues Raised by 18 U.S.C. § 1957* (1993) 34 Wm. & Mary L.Rev. 1291, 1329.)

"In a [section] 1956 prosecution, the government does not have to trace proceeds involved in a scheme back to a particular offense. The government need only present evidence that the defendant engaged in conduct typical of criminal activity and had no other legitimate source of funds. Evidence of a lack of a legitimate source of income standing alone will probably not support a conviction. The jury, however, may permissibly draw an inference from this fact and other circumstantial evidence to conclude that the proceeds could have been derived only from an illegal source. The lack of a tracing

---

[4] Section 1956(a)(1) requires proof the person knew "the property *involved* in a financial transaction represents the proceeds of some form of unlawful activity." (Italics added.)

requirement is a particularly important aspect of [section] 1956, as it provides the government a way to prosecute a predicate offense without having to prove the predicate offense. [¶] Further, [section] 1956 does not require tracing when illegal proceeds are commingled with legitimate funds. To obtain or uphold a conviction, the government need only prove that part of the funds involved in a transaction represent illegal proceeds." (McGuinn, *supra*, 43 Am. Crim. L.Rev., at pp. 749–750, fns. omitted.) Thus, for example, the court in *U.S. v. Abbell, supra*, 271 F.3d at pp. 1295–1296, footnote 5, stated: "The amount of illegal money that needs to be combined with another, larger amount of legal money need only be slight to render all the money commingled and, therefore, illegal." (See also *U.S. v. Jackson* (7th Cir. 1991) 935 F.2d 832, 840 [Section "1956(a)(1)(A)(i) . . . allow[s] for convictions where the funds involved in the transaction are derived only in part from 'specified unlawful activities' "]; *U.S. v. Wilkinson* (4th Cir. 1998) 137 F.3d 214, 222 ["the government need not prove that all of the money involved in the transfers constituted the proceeds of wire fraud; it is sufficient if the government proves that at least part of the money represented such proceeds"]; *U.S. v. Garcia* (9th Cir. 1994) 37 F.3d 1359, 1365.)

### (b)  *Section 1957 Tracing Requirements*

There is some disagreement among the circuit courts as to what tracing is required in a section 1957 prosecution. (*U.S. v. Jamieson* (6th Cir. 2005) 427 F.3d 394, 404.) Some circuits hold no tracing is required. (See, e.g., *U.S. v. Sokolow* (3rd Cir. 1996) 91 F.3d 396, 409 [there is no "legal requirement that the government trace the funds constituting criminal proceeds when they are commingled with funds obtained from legitimate sources"]; *U.S. v. Moore, supra*, 27 F.3d 969, 977 ["it may be presumed in such circumstances, as the language of section 1957 permits, that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity or derived from that activity"]; *U.S. v. Davis* (5th Cir. 2000) 226 F.3d 346, 357 ["when the aggregate amount withdrawn from an account containing commingled funds exceeds the clean funds, individual withdrawals may be said to be of tainted money, even if a particular withdrawal was less than the amount of clean money in the account"]; *U.S. v. Johnson* (10th Cir. 1992) 971 F.2d 562, 570 [there is no requirement that government "show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity"].)

The Ninth Circuit in *Rutgard, supra*, 116 F.3d 1270 took a different approach. The court began by noting the different proof requirements for sections 1956 and 1957: "[Section] 1956(a)(1). For present purposes, five elements of [section] 1956 differentiate it from [section] 1957, the statute at

issue here—its title, its requirement of intent, its broad reference to 'the property involved,' its satisfaction by a transaction that 'in part' accomplishes the design, and its requirement that the intent be to commit another crime or to hide the fruits of a crime already committed. [¶] Section 1957 has a different heading: 'Engaging in monetary transactions in property derived from specified unlawful activity.' It punishes by up to ten years' imprisonment and a fine anyone who: 'knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity.' " (*Rutgard*, at p. 1291.)

The court noted that section 1957(a) "does not speak to the attempt to cleanse dirty money by putting it in a clean form and so disguising it" but "applies to the most open, above-board transaction." (*Rutgard, supra*, 116 F.3d at p. 1291.) Because section 1957 does not require "[t]he intent to commit a crime or the design of concealing criminal fruits," it appears "easier to prove" on the one hand, but more difficult on the other hand, because it does not contain "references to 'the property involved' and the satisfaction of the statute by a design that 'in part' encompasses the intended result." (*Rutgard*, at p. 1291.) The court observed: "[Section 1957] is a powerful tool because it makes any dealing with a bank potentially a trap for the drug dealer or any other defendant who has a hoard of criminal cash derived from the specified crimes. If he makes a 'deposit, withdrawal, transfer or exchange' with this cash, he commits the crime; he's forced to commit another felony if he wants to use a bank. This draconian law, so powerful by its elimination of criminal intent, freezes the proceeds of specific crimes out of the banking system. As long as the underlying crime has been completed and the defendant 'possesses' the funds at the time of deposit, the proceeds cannot enter the banking system without a new crime being committed." (*Ibid.*) "Such a powerful instrument of criminal justice should not be expanded by judicial invention or ingenuity. We 'should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute.' " (*Id.* at p. 1292.)

Because of the differences between sections 1956 and 1957, the *Rutgard* court did not believe reliance on section 1956 tracing decisions was proper and criticized those courts that had done so. (*Rutgard, supra*, 116 F.3d at p. 1292.) After recognizing that section 1957 could not "be made wholly ineffective by commingling," the court explained what proof was required to prove a section 1957 violation: "To prevail, the government need show only a single $10,000 deposit of criminally-derived proceeds. Any innocent money already in the account, or later deposited, cannot wipe out the crime committed by the deposit of criminally-derived proceeds. Commingling with innocent funds can defeat application of the statute to a withdrawal of less than the total funds in the account, but ordinarily that fact presents no

problem to the government which, if it has proof of a deposit of $10,000 of criminally-derived funds, can succeed by charging the deposit as the crime; or the government may prevail by showing that all the funds in the account are the proceeds of crime.. [Citation.] Commingling will frustrate the statute if criminal deposits have been kept under $10,000. But that is the way the statute is written, to catch only large transfers. Moreover, if the criminal intent was to hide criminal proceeds, as would presumably be the case any time criminally derived cash was deposited with innocently derived funds to hide its identity, [section] 1956 can kick in and the depositor of amounts under $10,000 will be guilty of a [section] 1956 crime." (*Rutgard*, at p. 1292.)

In sum, the *Rutgard* court, after noting section 1957 was a potentially draconian law because it eliminated criminal intent, concluded that in a section 1957 case involving commingled funds, the government could show: (1) the defendant's entire business was illegal; (2) a single deposit of $10,000 or more in criminally derived funds; or (3) all the funds were transferred out of the account. The *Rutgard* court rejected the theory that proof of criminally derived funds in an account creates a presumption that those funds are involved in a later transfer from the account. (*Rutgard, supra*, 116 F.3d at pp. 1292–1293.)

### (C) *Comparison of the California and Federal Statutes*

The California statute has aspects of both sections 1956 and 1957. Like section 1956, the California statute has a mens rea requirement beyond knowing that the proceeds derive from criminal activity. Section 1956 requires a showing the defendant had the intent to promote the carrying on of a specified unlawful activity or to violate the Internal Revenue Code and to conceal the illegal source of the money or avoid a transaction reporting requirement. The California statute requires a showing the defendant had either: "the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity," or knew "the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity . . . ." (Pen. Code, § 186.10, subd. (a).) The California statute, however, also requires a minimum transactional amount ($5,000), while section 1956 does not specify the amount of proceeds that must be involved in the transaction.

The California statute is similar to section 1957 in that both statutes have a minimum transactional amount ($5,000 under the California statute and $10,000 under the federal statute). Additionally, both statutes may be violated when the defendant knowingly conducted (or engaged in) a monetary transaction that was derived from the proceeds of criminal activity.

■ In sum, if a prosecution under the California money laundering statute proceeds on a theory the defendant had the specific intent to promote criminal activity, the proceeding involves an intent requirement similar to section 1956, but additionally has a $5,000 minimum transactional amount. (Pen. Code, § 186.10, subd. (a).) If the California prosecution proceeds on a theory the defendant knew the monetary instrument directly or indirectly represented criminal proceeds, then the California proceeding has an intent requirement similar to section 1957 and, as with section 1957, requires proof of a minimum amount.

### (D)   *Tracing Commingled Funds in a California Money Laundering Offense*

■ "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) "[W]e look first to the language of the statute. [Citation.] In interpreting that language, we strive to give effect and significance to every word and phrase." (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1284 [48 Cal.Rptr.3d 183, 141 P.3d 288]; see *Szold v. Medical Bd. of California* (2005) 127 Cal.App.4th 591, 596 [25 Cal.Rptr.3d 665].) "We give the words of a statute their ordinary and usual meaning and construe them in the context of the statute as a whole." (*American Liberty Bail Bonds, Inc. v. Garamendi* (2006) 141 Cal.App.4th 1044, 1052 [46 Cal.Rptr.3d 541]; see *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) "We must presume that the Legislature intended 'every word, phrase and provision . . . in a statute . . . to have meaning and to perform a useful function.' " (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

"If there is no ambiguity in the language of the statute, 'then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs.' [Citation.] 'Where the statute is clear, courts will not "interpret away clear language in favor of an ambiguity that does not exist." [Citation.]' " (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976]; see *People v. Benson* (1998) 18 Cal.4th 24, 30 [74 Cal.Rptr.2d 294, 954 P.2d 557].) " '[T]he "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . . Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute.' [Citation.] ' " 'Statutes should be construed so as to be given a reasonable result consistent with the legislative purpose.' [Citations.] . . . 'The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy,

and contemporaneous construction.' " ' " (*Rincon Del Diablo Municipal Water Dist. v. San Diego County Water Authority* (2004) 121 Cal.App.4th 813, 818 [17 Cal.Rptr.3d 666]; see *Thornburg v. Superior Court* (2006) 138 Cal.App.4th 43, 49 [41 Cal.Rptr.3d 156].)

"If the statute is ambiguous, we may consider a variety of extrinsic aids, including legislative history, the statute's purpose, and public policy." (*American Liberty Bail Bonds, Inc. v. Garamendi, supra*, 141 Cal.App.4th 1044, 1052; see *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].)

■ California law punishes a transaction or transactions conducted within a seven-day period "involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000)" with either the specific intent to promote or carry on criminal activity or "knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity." (Pen. Code, § 186.10, subd. (a).)

The words of California's money laundering statute are clear in providing the monetary instrument (or instruments within a seven-day period) must have "a total value exceeding five thousand dollars." The words of the statute are also clear that when the defendant conducts a $5,000 plus transaction with the intent to promote or facilitate criminal activity, the defendant is guilty of money laundering. Under those circumstances, there is no need to trace any funds since the offense and the requisite mens rea of a specific intent to promote or facilitate criminal activity do not require the money be derived from an illegal source.

We believe the statute is also clear as to the requirements when a defendant is charged under a theory he conducted the transaction with a monetary instrument of at least $5,000 "knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity." (Pen. Code, § 186.10, subd. (a).)

The Attorney General contends no tracing is required, arguing that "even if every dollar of each deposit was not from cash received for sex acts, the deposits *represented* the illicit enterprise and were at least *indirectly* derived from the illicit sexual acts." Relying on dictionary definitions of the words "represent" and "indirect," the Attorney General argues: "The plain and common meaning of these key words of the statute are a reliable indicator of the Legislature's intent that not every dollar of a transaction must be traced to actual proceeds of illegal activity." The Attorney General also argues this interpretation is consistent with legislative intent that the "transactions" are to

be broadly defined. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1470 (1985–1986 Reg. Sess.) as amended Jan. 29, 1986, pp. 1–2.)

██  We find this to be an overly broad interpretation that is not consistent with the language of the statute or the legislative intent. Theoretically, under the Attorney General's theory, if an individual deposited $20 in cash from a one-time sale of cocaine base into a checking account that otherwise contained legally obtained funds and then wrote a large check from the account to cover a downpayment on a house, he would have committed money laundering and be subject to incarceration and/or a fine of $250,000 or twice the value of the property transacted. (Pen. Code, § 186.10, subd. (a).) The statutory language, however, specifies that the individual conduct the transaction with the monetary instrument or instruments "knowing that the *monetary instrument*"—which must be at least $5,000—rather than the transaction, *"represents the proceeds* of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering." (Pen. Code, § 186.10, subd. (a), italics added.) Thus, the statutory language provides that the monetary instrument or instruments must be composed of at least $5,000 of proceeds from criminal activity; that is, there must be proof that the monetary instrument involved $5,000 of criminal proceeds; it is not sufficient merely to show the transaction was of more than $5,000 and from an account with commingled funds.

The legislative history indicates the Legislature was concerned with large scale criminal activity and large amounts of cash being laundered through California financial institutions. Imposing a $5,000 threshold on the amount of criminal proceeds involved in the transaction is consistent with a focus on a larger scale of criminal activity.

We are unpersuaded by the Attorney General's argument that the legislative intent for a broad definition of "transactions" supports its interpretation of the statute.[5] In light of the words of the statute and the legislative history, the $5,000 minimum amount applies to the amount of the criminal proceeds that must be involved in the monetary instrument(s). Therefore, it is not sufficient to show that the transaction involved over $5,000 and some portion of this amount derived from criminal activity; there must be a showing that at least $5,000 of the amount involved in the transaction is related, directly or indirectly, to criminal activity.

---

[5] See Penal Code section 186.9, subdivision (c): " 'Transaction' includes the deposit, withdrawal, transfer, bailment, loan, pledge, payment, or exchange of currency, or a monetary instrument, as defined by subdivision (d), or the electronic, wire, magnetic, or manual transfer of funds between accounts by, through, or to, a financial institution as defined by subdivision (b)."

■ We agree with the Ninth Circuit's opinion in *Rutgard*. Thus, we conclude a Penal Code section 186.10, subdivision (a) prosecution based on a defendant's conducting a transaction through a financial institution with a monetary instrument of $5,000 or more based on the knowledge of criminal proceeds theory, requires proof that (1) the defendant's entire business was illegal, (2) there were deposits of $5,000 or more in criminally derived funds, or (3) there was a transfer of all funds out of the account.

In this case, the prosecution proved Mayo had the intent to promote or facilitate criminal activity through monetary instrument(s) of $5,000 or more, all the funds represented criminally derived funds, there were deposits of $5,000 or more in criminally derived funds, and there were transfers out of an account that exceeded the clean money in the account.

(E)  *Vagueness*

Mayo argues Penal Code section 186.10, subdivision (a) is unconstitutionally vague because it fails "to specify what proportion of the requisite transaction of the total value exceeding $5,000 must be 'laundered' with the specific intent to promote criminal activity, or what proportion of the requisite transaction of the total value exceeding $5,000 must represent the proceeds of, or be derived directly or indirectly from the proceeds of, criminal activity."

■ "Statutes are presumed valid and must be upheld unless their unconstitutionality is positively and unmistakably demonstrated." (*People v. Basuta* (2001) 94 Cal.App.4th 370, 397 [114 Cal.Rptr.2d 285].) "Due process requires fair notice of what conduct is prohibited. A statute must be definite enough to provide a standard of conduct for its citizens and guidance for the police to avoid arbitrary and discriminatory enforcement. [Citations.] 'Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.' " (*People v. Townsend* (1998) 62 Cal.App.4th 1390, 1400–1401 [73 Cal.Rptr.2d 438]; see also *People v. McKay* (2002) 27 Cal.4th 601, 634 [117 Cal.Rptr.2d 236, 41 P.3d 59].) "[A] claim that a law is unconstitutionally vague can succeed only where the litigant demonstrates, not that it affects a substantial number of others, but that the law is vague as to [him] or 'impermissibly vague in all of its applications.' " (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1116 [60 Cal.Rptr.2d 277, 929 P.2d 596], italics omitted.)

Mayo's argument that his convictions should be reversed is based on a theory the money laundering statute is unconstitutionally vague since it could allow conviction based on a showing only a portion of the $5,000 minimum

was laundered with the specific intent to promote criminal activity or represented, directly or indirectly, the proceeds of criminal activity.

As we have explained, the money laundering statute requires a showing the $5,000 minimum must be laundered with the specific intent to promote criminal activity or were, directly or indirectly, the proceeds of criminal activity and, as we subsequently explain, that showing was made in this case. Accordingly, no unconstitutional vagueness affected Mayo's case.

## II

### Sufficiency of the Evidence

Mayo contends the evidence is insufficient to support his money laundering convictions because "the prosecution failed in its burden to prove that the total value of the requisite transactions exceeding $5,000 was derived from criminal activity, or that the total value of the requisite transactions exceeding $5,000 was conducted with the specific intent to promote, etc., criminal activity." He asserts he "had several legitimate, legal sources of income, including his graphic art design, his record label, Supreme Records, and his music studio." He also asserts that "[c]onsidered in a light most favorable to the prosecution, at best, the evidence demonstrates approximately 40% of the business conducted through Exotic Secrets was legal."

When an appellant challenges the sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374]; see *People v. Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009].) We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119]; see *In re Manuel G.* (1997) 16 Cal.4th 805, 822 [66 Cal.Rptr.2d 701, 941 P.2d 880].) We draw all reasonable inferences in support of the judgment. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899]; *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1220–1221 [64 Cal.Rptr.2d 545].)

Initially, we note Mayo has failed to meet his burden of showing error. On appeal, we presume the judgment is correct and we will not reverse unless the appellant establishes error occurred and that the error was prejudicial. (*People v. Kelly* (1986) 183 Cal.App.3d 1235, 1240 [228 Cal.Rptr. 681].) When a challenge to the sufficiency of the evidence is made, the appellant

bears the burden of setting forth a fair and accurate statement of the facts. (*Valentine v. Read* (1996) 50 Cal.App.4th 787, 796 [57 Cal.Rptr.2d 836].) It is not sufficient to assert there was error; the appellant must support his claim by citations to the record. (*People v. Woods* (1968) 260 Cal.App.2d 728, 731 [67 Cal.Rptr. 396].)

Here, Mayo asserts he had income from his graphic art design business, his record label and his music studio businesses.[6] However, his citations to the record involve only his testimony about his music businesses. That testimony indicates he rented the music studio to others on either a daily or hourly rate; that he sold compact discs from a cart or a car through other persons who would receive a percentage of the sales, or through record stores; and that he produced "beats for people," that is, he engaged in ghostwriting songs. Nowhere in this testimony is there any indication that these businesses generated any profits or significant amount of money. No business or financial records were found during a search of the Palm Street suites. Mayo has not shown there was any substantial evidence to reasonably support a finding that any portion, let alone any significant portion of the cash deposits involved in the money laundering counts involved money derived from his graphic art or music businesses. Indeed, given the evidence presented, a reasonable jury could conclude Mayo's music and graphic businesses were mere hobbies, funded by his escort/prostitution business, rather than businesses that generated profits that were deposited in the financial institutions.

Mayo also claims "the evidence demonstrates approximately 40% of the business conducted through Exotic Secrets was legal." This argument is based on testimony indicating that six or seven out of every 10 customers requested sexual services, that is, 60 or 70 percent of customers received sexual services and, thus, 30 or 40 percent of the customers received only escort services. However, it does not follow that 30 or 40 percent of the deposits represented escort fees rather than fees generated by illegal activities; fees for the sexual services were typically several times the fees generated by the legal escort services.

Moreover, the escort business was inextricably intertwined with the prostitution business. The evidence indicates that only one of the core group of women who worked for Mayo, Nicole H., refused to engage in sexual services. Nicole H. only stayed at the Ewing Drive house for about a month and a half. She left because she was "different" from the other women, all of whom she believed were engaging in sexual acts on escort calls. Implicit in Nicole H.'s testimony was that she had been expected to engage in sexual

---

[6] We note the record shows Mayo also received annuity payments as a result of a malpractice case when Mayo was a child. These transactions were identified by the prosecutor's expert and were not part of the deposits involved in the money laundering counts.

services on escort calls and that she could not continue to work at Mayo's escort business unless she engaged in illegal sexual services as did the other women who worked for the escort service. An inference can be drawn that Mayo's escort service was in the business of providing sexual services for money and not legal escort services.

While Nicole H.'s testimony indicates that she did not engage in any sexual services and therefore her income did not involve any illegal activity, she only lived in the Ewing Drive residence and worked for Mayo's escort service for about a month and a half during August and the first part of September 2002. None of the money laundering counts involved this period.

Contrary to Mayo's suggestion, this is not a case where there was a need to trace funds from different sources on the basis some of the funds were from legal sources since the escort business was not a legitimate, legal business; it was merely the means of conducting the prostitution business. A reasonable jury could conclude the fees generated by the escort business represented the indirect proceeds of criminal activity. The money laundering statute does not require that all funds directly result from criminal activity; a money laundering conviction is proper when a person conducts a transaction through a financial institution "knowing that the monetary instrument represents the proceeds of, or is *derived directly or indirectly from the proceeds of, criminal activity . . . .*" (Pen. Code, § 186.10, subd. (a), italics added.)

Furthermore, there was substantial evidence to support a money laundering conviction based on the alternate mens rea requirement, that is, that all of the funds were deposited "with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of [a] criminal activity." (Pen. Code, § 186.10, subd. (a).) Mayo used the cash deposits to promote and carry on the prostitution business by paying for office space to conduct the prostitution business through his escort business; paying for a residence that promoted the prostitution business by allowing Mayo to retain control over the women and to obtain all their earnings from prostitution in exchange for providing them with shelter; and by paying for the cell phones that were used to carry on the prostitution business.

In sum, the People produced substantial evidence to support a finding beyond a reasonable doubt that the money laundering requirement of a minimum transactional amount of $5,000 was met.

## III

### *Instructional Error*

Mayo contends the court erred both when it provided instructions to the jury defining the elements of money laundering and in responding to a jury

note. He contends the court failed to fully instruct the jury on the elements of money laundering by not telling the jury that the entire minimum transactional amount must meet the mens rea requirements. We disagree.

■ A trial court must sua sponte instruct "on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].) The trial court must instruct the jury on all elements of the charged offenses. (*People v. Flood* (1998) 18 Cal.4th 470, 480 [76 Cal.Rptr.2d 180, 957 P.2d 869].) As to additional matters "falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

The statutory language defining a crime "is generally an appropriate and desirable basis for an instruction . . . . If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language." (*People v. Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].) "The rule to be applied in determining whether the meaning of a statute is adequately conveyed by its express terms is well established. When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning. [Citation.] Thus, as the court in *People v. Richie* (1994) 28 Cal.App.4th 1347 [34 Cal.Rptr.2d 200] explains, terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance." (*People v. Estrada, supra*, 11 Cal.4th at pp. 574–575, italics omitted.)

■ Here, the statutory language was sufficient to instruct the jury as to the elements of the offense. Contrary to Mayo's contention, the phrase "total value exceeding $5,000" has no technical or peculiar legal meaning; the phrase uses commonly used English words in their ordinary sense. Thus, the court was not required to sua sponte give additional instructions on the meaning of the phrase.

During deliberations, the jury submitted a note, stating: "We need clarification of the importance of the $5000 requirement for laundering. ~~Is it just a trigger, or~~ Does ~~the entire~~ at least $5000 have to be spent on criminal activity?"

The court drafted a proposed response and conferred with counsel. Both counsel agreed to the response given to the jury, which stated:

"The money laundering charges require proof beyond a reasonable doubt of all the elements set out in your jury instruction.

"Specifically with regard to the $5000 amount, the law requires proof beyond a reasonable doubt that the 'transaction' (or group of transactions within seven days) be in this amount or more. As defined by your instruction, the 'transaction' can be a 'deposit, withdrawal, transfer or payment of a monetary instrument.'

"The only element to which the $5000 applies is that the transaction (or transactions) must be in this amount or more.

"Specifically as to whether the $5000 has to be spent on criminal activity, you may be asking about the two alternative intent elements. These elements require proof beyond a reasonable doubt that the 'transaction' was conducted either (1) with the specific intent to promote, manage, etc. any criminal activity or (2) with knowledge that the 'monetary instrument' is the proceeds etc. of criminal activity."

Initially, we note that Mayo agreed to the language in the court's response and, thus, under the invited error doctrine, he may not raise the error on appeal. (See *California Coastal Com. v. Tahmassebi* (1998) 69 Cal.App.4th 255, 260 [81 Cal.Rptr.2d 321] [" 'It is settled that where a party by his conduct induces the commission of an error, under the doctrine of invited error he is estopped from asserting the alleged error as grounds for reversal' "]; *People v. Catlin* (2001) 26 Cal.4th 81, 150 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Moreover, even if we deemed the error not waived, we would not reverse.

The court's response was correct. It reiterated to the jury that the prosecutor was required to prove beyond a reasonable doubt that the transaction(s) must be "in this amount or more," that is, must total at least $5,000. The court's response also properly addressed the jury's question as to whether the "$5000 has to be spent on criminal activity" by focusing the jury's attention on the alternate intent requirements.

## DISPOSITION

The judgment is affirmed.

Benke, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied March 21, 2007, and appellant's petition for review by the Supreme Court was denied May 16, 2007, S151678. Kennard, J., was of the opinion that the petition should be granted.