Filed 1/24/14  P. v. Jimenez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062500 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD238210) |
| JORGE JIMENEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Leo Valentine, Jr., Judge.  Affirmed in part and reversed in part with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon and Barry Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jorge Jimenez of four counts of forcible rape (Pen. Code,[1] § 261, subd. (a)(2)); one count of forcible penetration with a foreign object (§ 289, subd. (a)(1)(A)); one count of kidnapping (§ 207, subd. (a)); and one count of false imprisonment (§§ 236 & 237, subd. (a)).  The victim of each of these crimes was the mother of two of his children, C.R., with whom he had a long and violent history. Jimenez was sentenced to an aggregate term of 30 years to life plus 12 years.

On appeal, Jimenez contends the judgment must be reversed because the trial court abused its discretion in permitting the prosecution to introduce evidence of prior uncharged acts of domestic violence, in admitting expert testimony on domestic violence and in instructing the jury on the import of the evidence of the uncharged domestic violence.  Jimenez also challenges the $10,000 restitution fine that appears in the court's minutes and the abstract of judgment.

As we explain, we reject Jimenez's challenge to his conviction.  Given the role domestic violence played in the crimes Jimenez committed against C.R., the trial court acted well within its discretion in admitting evidence of the uncharged domestic violence. Moreover, the trial court properly admitted expert testimony on domestic violence and properly instructed the jury on the use of evidence of prior domestic violence.

We nonetheless remand to the trial court so that it can clarify a conflict in the record with respect to the amount of the restitution fine it imposed.

---

[1]	All further statutory references are to the Penal Code unless otherwise indicated.

2

FACTUAL AND PROCEDURAL BACKGROUND

A.     Prosecution Case

1.     *C.R. and Jimenez's relationship*

At the age of 15, C.R. began dating Jimenez and, from the start of their relationship, he abused her. Jimenez would beat and insult C.R. almost every day. Nonetheless when, in 2006, C.R. become pregnant, she moved in with Jimenez and his family.

The abuse continued after the birth of their first child, R. In one incident, Jimenez threatened to kill R. and C.R.; in another, in which Jimenez was upset with his birthday cake, he broke a cell phone, punched C.R.'s father in the jaw, and shoved her mother, causing C.R.'s mother to fall and break her foot.

In 2007, C.R. obtained a restraining order against Jimenez and moved back to her parents' home. However, notwithstanding the restraining order and Jimenez's violation of it, C.R. continued to see Jimenez and eventually became pregnant with another child by him. According to C.R., she hoped Jimenez would change.

2.     *2009 Kidnapping*

In March 2009, C.R. had a disagreement with her mother and attempted to take the children to a shelter. On the way to the shelter, C.R. stopped at an ATM and saw Jimenez.

When C.R. returned from the ATM to her car, Jimenez was in the passenger seat. When C.R. got into the car, Jimenez held a knife against her leg and told her that they

"were going to go to Tijuana" because Jimenez knew C.R. had been seeing someone else. C.R. told Jimenez she did not want to go to Tijuana. However, after arguing with Jimenez, C.R. agreed because she was afraid Jimenez might take the children, who were in the backseat of the car.

In Tijuana, they stayed at a friend's house for about two months, where Jimenez beat C.R. approximately four times. After two months, Jimenez let the children go back to the United States because there was no food for them to eat. Eventually, C.R. came back to the U.S. and stayed with her parents.

3. *2010 Kidnapping (Acquitted) and Rape*

In March 2010, C.R. and Jimenez agreed to meet because Jimenez said he wanted some reconciliation with her. Although they had agreed to meet at a park, when C.R. stopped at a store to get milk, Jimenez got into C.R.'s car, tried to aggressively kiss her and immediately started grabbing her breasts. C.R. pushed Jimenez away, and she poked him in the nose causing him to bleed.

Although C.R. rejected Jimenez's advances, they drove to a liquor store where Jimenez got out of the car with one of the children and left C.R. in the car with the other child. C.R. was afraid to leave her other child and, for that reason, did not try to escape. C.R. did however attempt to send a text message to her sister asking her sister to help her. In response, C.R.'s family attempted to track the location of her cell phone on the internet.

When Jimenez returned to the car, he and C.R. drove around, eventually stopping

4

on a street. Jimenez forced C.R. to pull her pants down because he wanted to have intercourse. At one point, one of the children started to cry and C.R. embraced one of the children while Jimenez forced her to have intercourse with him. Jimenez ignored C.R.'s requests to stop and instead told her she was always going to be his, not anyone else's and he was going to rape her again.

Jimenez drove near the University of San Diego and, once the car stopped, C.R. tried to run away. Jimenez threw a cell phone at C.R., chased her down, grabbed her by the hair and pulled her back to the car. Jimenez then hit C.R. on the side of the face with her shoe, causing it to bruise. They then drove to another area of town and, when Jimenez got out of the car, C.R. locked the car doors so he could not get in again. Jimenez forcefully hit the car windows. C.R.'s family arrived about this time, and Jimenez left the scene.

4.    *2011 Kidnapping and Rape*

In the spring and fall of 2011, C.R. was dating Jimenez's cousin, Hernan. However, she did not disclose the relationship to Jimenez. In the fall, C.R. broke up with Hernan and then began dating him again, although she was still afraid that Jimenez would find out about the relationship.

In October 2011, Jimenez told C.R. he wanted to see the children again and she began taking the children to Jimenez's parents' house two to three times a week. During this period, she had consensual intercourse with Jimenez on one occasion to see if he would be a little bit calmer with her. Although they had intercourse that one time and

5

had been spending time together for the sake of the children, C.R. did not want "to take another chance with [Jimenez]."

In December 2011, Jimenez began sending C.R. text messages stating that he still loved her and he would not tolerate her seeing anyone else. C.R. replied to the text by suggesting that maybe they could have another child together. On the evening of the texts, Jimenez followed C.R. to work. He was driving his father's car. In the parking lot of C.R.'s work, Jimenez backed up into another car. C.R. spoke with the other driver because Jimenez does not speak English.

After C.R. assisted Jimenez, he grabbed her by the shirt, forced her into his car and attempted to remove her pants. C.R. repeatedly told Jimenez "no" and to leave her alone. Jimenez told C.R., "You are going to see the man that I am" and "I am going to fuck you in the front seat"; he also called her a whore. Jimenez then forced C.R. to have intercourse with him in the parking lot of her work and also stuck his finger in her anus.

When Jimenez was finished having sex with C.R., he punched her in the face and also removed the battery from her cell phone so her family would be unable to locate her using the phone's GPS "like last time." Before leaving the parking lot, C.R. removed her work shirt and threw it out the window near the car she had driven to work because she knew her mother would come looking for her.

Jimenez told C.R. he was going to cut or burn her face so that no one else would love her and also threatened to report her to immigration. Jimenez then drove them to another location where he told C.R. to get into the back seat. Out of fear of being hit

6

again, C.R. complied. Jimenez raped C.R. again and burned her leg with a cigarette lighter. He then told her to turn over. When C.R. resisted, Jimenez threatened to stick a squeegee in her anus. Once again out of fear, C.R. complied and Jimenez got on top of her and started to have sex with her. According to C.R., while he was assaulting her, Jimenez would be angry one moment and tell C.R. this was her fault and she was a whore and the next moment become emotional and tell C.R. that he loved her.

At some point, Jimenez let C.R. out of the car to urinate. C.R. did not try to flee, as she was wearing only a T-shirt and was otherwise naked. After she urinated, C.R. used a shirt that was in Jimenez's car to wipe herself. While C.R. was outside the car, Jimenez received a phone call from his mother. After the phone call from his mother, Jimenez became nervous and told C.R. her mother had sent the police to his parents' house. Jimenez then drove C.R. two blocks from her workplace and told her to get out of the car. He threw her clothes at her and left.

C.R. returned home and told her parents what had happened. She felt too ashamed to call the police, so her mother did.

Police seized Jimenez's father's car and found C.R.'s iPod and a T-shirt with semen stains on it. The semen was eventually identified as Jiminez's.

On the next day, C.R. made a recorded call to Jimenez. In the call, Jimenez apologized to C.R. for what he had done the day before and told her he did it because she had been cheating on him with his cousin. He also stated that it was a mistake to leave the T-shirt she used to wipe herself in his father's car.

7

B.    Jimenez's Defense

Jimenez took the stand in his own defense. According to Jimenez, he never committed any acts of domestic violence on C.R. and did not have sex with her without her consent. Jimenez testified, that together, he and C.R. came up with a plan to obtain lawful resident status for C.R. by fabricating claims that she had been the victim of domestic violence. The text C.R. sent to her sister in March 2010 was part of the plan to convince everyone that her domestic violence claims were true.

Jimenez admitted that he had been arrested for drug possession and deported. Jimenez stated that he returned to the United States after his deportation and that he moved into C.R.'s parents' house upon his return, where he admitted he got into an altercation with C.R.'s father. After the altercation, he left C.R.'s parents' home. C.R. continued to contact him and, at one point, suggested that they could have another child.

In 2011, at C.R.'s insistence, they had sex in his father's car three times at or near the parking lot of her work. At one point, he playfully threatened to shove a squeegee up her behind; at another point, he got mad at C.R. because she had taken the battery out of her cell phone and he could not see if she had been in contact with his cousin Hernan. According to Jimenez, he accidentally hit C.R. on the mouth and accidentally burned her with a cigarette lighter.

Jimenez explained that, in his recorded conversation with C.R., when he said "I know," he did not mean to agree with C.R.'s statement that, on the previous evening, she had told him she did not want to have sex with him. According to Jimenez, he only

8

meant to acknowledge that he knew she was going to call him.

DISCUSSION

I

In his principal contention on appeal, Jimenez contends the trial court abused its discretion in permitting the prosecution to introduce unlimited evidence of prior domestic violence acts between Jimenez and C.R. We find no abuse of discretion.

A.      Failure to Identify Objectionable Evidence

As the People point out, although the prosecution case contained a great deal of evidence with respect to the violent and turbulent nature of Jimenez's relationship with C.R., on appeal, Jimenez does not argue that any particular item of evidence should have been excluded. Indeed, in his brief, Jimenez "recognizes that certain evidence would have been admissible to lend context to [C.R.'s] testimony and explain her complicated history with the father of her children. Thus, under [Evidence Code] section 352, [Jimenez] concedes some testimony regarding acts of domestic violence were relevant." Nonetheless, Jimenez argues that "[w]hat should not have been allowed was the unlimited admission of testimony by numerous witnesses regarding incidents leading to the issuance of a temporary restraining order, cumulative and detailed testimony about incidents that had no relevance to the current charges, and expert opinion that [C.R.] fit the profile of a victim of intimate partner violence."

This approach to appellate advocacy is ineffective in important respects. First, in failing to specify, with citations to the record, which items of evidence he believes were

9

cumulative and excessive under Evidence Code section 352, Jimenez fails to meet his burden on appeal. California Rules of Court, rule 8.204(a)(1)(C) requires that a brief "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Thus, "[w]hen an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited. [Citations.]" (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.)

Secondly, Jimenez's approach conveniently ignores *his* duty to establish both that an error occurred and that the error was prejudicial. "On appeal, we presume the judgment is correct and we will not reverse unless the appellant establishes error occurred and that the error was prejudicial." (*People v. Mays* (2007) 148 Cal.App.4th 13, 33; see also *People v. Kelly* (1986) 183 Cal.App.3d 1235, 1240 ["[p]rejudice will never be presumed at the appellate level; it is incumbent upon appellants to affirmatively show they have been prejudiced by an alleged error"].) Here, by simply asserting the trial court admitted too much domestic violence evidence, without specifying which evidence was undue or unfair, Jimenez invites the court to comb the record to decide which pieces of evidence were sufficiently related to the charges against him to be admitted and which pieces of evidence were either not directly relevant to the charges or cumulative and what effect, if any, such objectionable evidence may have had on the jury's verdict. This is, of course, an invitation we must decline. (*People v. Mays*, *supra*, at p. 33.)

10

Although Jimenez does not specify which domestic violence evidence, if any, was improperly admitted, our review of the record discloses no abuse of discretion on the part of the trial court in admitting evidence of the violence C.R. endured over the course of her relationship with him. A full presentation of the violent and abusive nature of their relationship was needed so that the jury could understand that although C.R. attempted to maintain a relationship with Jimenez over a lengthy period of time, and did consent to sexual relations with him from time to time, he was nonetheless capable of extreme violence towards her and members of her family.

B.     Inference to Be Drawn From Domestic Violence Evidence

Jimenez's failure to specify which domestic violence evidence was excessive and cumulative and how he was prejudiced by any particular piece of evidence not only ignores his burden on appeal, it is also a useful indication that his real complaint is with the rule of law that permitted the prosecution to offer *any* domestic violence evidence. Indeed, Jimenez contends that "[m]ost importantly, the jury should not have been allowed to make the inference that because appellant had engaged in acts of domestic violence, he was likely also to commit the charged acts of sexual violence." This more fundamental argument was squarely rejected in *People v. Poplar* (1999) 70 Cal.App.4th 1129: "Evidence Code section 1109 allows the introduction of evidence of defendant's commission of prior acts of domestic violence in a criminal action charging defendant with an offense involving domestic violence.

"Defendant argues that Evidence Code section 1109 and Penal Code section 13700

11

'refer to the classic kind of pushing, shoving, hitting, slapping, punching' and not to 'a specific sexual offense such as rape.' He claims that '[i]f the Legislature had desired to connect prior squabbles around the house with current rape charges it could have done so with considerably more specific language,' as it did with Evidence Code section 1108. Further, defendant claims that '[t]here is no logical disposition toward committing rape based on a prior physical hassle or verbal contest between domestic partners.' Defendant also asserts that the prosecutor erroneously argued that the prior incidents were the same as the current charge in that all incidents involved defendant's propensity for violence against women.

"'Domestic violence' is defined as 'abuse' committed against a cohabitant. ([Pen. Code,] § 13700, subd. (b).) 'Abuse' is defined as 'intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.' ([Pen. Code,] § 13700, subd. (a).)

"Defendant was charged with forcible rape, which is defined as 'an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, . . . [¶] . . . [¶] (2) [w]here it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another.' ([Pen. Code,] § 261, subd. (a)(2).)

"The definition of domestic violence/abuse ('reasonable apprehension of imminent serious bodily injury to . . . herself') encompasses the definition of rape ('fear of

12

immediate and unlawful bodily injury on the person'). Defendant was charged with an offense involving domestic violence, that is, rape. As the prosecutor argued, rape is a higher level of domestic violence, a similar act of control." (*People v. Poplar*, *supra*, 70 Cal.App.4th at pp. 1138-1139.)

We agree with the court in *People v. Poplar*: rape by a domestic partner is domestic violence. (See also *People v. Garcia* (2001) 89 Cal.App.4th 1321, 1333-1334.) The fact that rape is an extreme form of violence does not take it outside the scope of Evidence Code section 1109 but instead places it at the very heart of the statute. Thus, the inference that the jury was permitted to draw between Jimenez's long history of violence toward C.R. and the crimes with which he was charged was proper.

## II

Jimenez argues the prosecution's domestic violence expert was improperly permitted to vouch for C.R.'s credibility and, thus, the ultimate issue of whether she consented to the charged crimes. There was no error in the manner in which the expert's testimony was presented.

Briefly, the expert explained to the jury that victims of domestic violence oftentimes stay in an abusive relationships or return to them because they become addicted to the good feelings they share with the abuser between violent incidents. The expert further testified that, based on what C.R. told him and based on what he read in police reports, C.R.'s behavior was consistent with someone in an abusive relationship. On cross-examination, the expert conceded he did not know whether the information

provided by C.R. was true. The trial court instructed the jury that the expert's testimony was not evidence Jimenez committed any crime but could be used only to determine whether C.R.'s behavior was "not inconsistent" with someone who had been abused.

It is now clear that an expert, based on foundational evidence in the record, may offer an opinion as to what, *if that evidence is credited*, a witness or defendant knew, believed or intended in a given circumstance. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1049-1051.) An expert may not, however, offer an opinion as to whether any foundational evidence should be believed. (*Vang*, at p. 1050.) The expert's testimony here falls squarely in the former, rather than latter, category: it properly left to the jury determination of whether the foundational facts the expert relied on were true. Thus, it was not objectionable. (See *Vang*, at pp. 1050-1051.)

### III

Next, Jimenez contends that CALCRIM No. 852, as given by the trial court, was unduly argumentative. We disagree.

In instructing the jury with respect to the evidence of domestic violence presented by the prosecution, the trial court provided the jury with a version of CALCRIM No. 852, which stated: "The People presented evidence that the defendant committed domestic violence that was not charged in this case.

"*Domestic violence* means abuse committed against an adult who is a person with whom the defendant has had a child.

"*Abuse* means intentionally or recklessly causing or attempting to cause bodily

14

injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit Forcible Rape, Rape by Foreign Object, Kidnapping, False Imprisonment By Violence, Menace, Fraud or Deceit, as charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Forcible Rape, Rape by Foreign Object, Kidnapping, False Imprisonment By Violence, Menace, Fraud or Deceit. The People must still prove each charge and allegation of every charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose."

Contrary to Jimenez's contention, this instruction did not unfairly insert any one-

15

sided characterization of the evidence and, instead, is analogous to the instruction approved by the court in *People v. Bonilla* (2007) 41 Cal.4th 313, 329-330. In *People v. Bonilla*, the trial court instructed the jury with CALJIC No. 2.03, which stated that if the jury found that the defendant made a willfully false or misleading statement about the crime for which he was charged, the jury could consider that as a circumstance showing the defendant's consciousness of guilt. Because the predicate of the instruction, a finding that the defendant made a willfully false or misleading statement, simply set forth the appropriate legal standard rather than one party's view of the evidence, it did not suffer from the defect found in *People v. Mincey* (1992) 2 Cal.4th 408, 437, where a proposed instruction included an express reference to the defendant's theory he was not guilty of torture but only "'a misguided, irrational and totally unjustified attempt at discipline.'"

Like the consciousness of guilt instruction considered in *People v. Bonilla*, CALCRIM No. 852 accurately and neutrally sets forth the legal principle established under Evidence Code section 1009, to wit: evidence of uncharged domestic violence, if believed, may be considered as evidence Jimenez committed the charged crimes. Unlike the defective instruction considered in *People v. Mincey*, CALCRIM No. 852 does not set forth any prosecution or defense view of the evidence. The trial court did not err in giving it.

IV

Under section 1202.45, the trial court must impose a parole revocation fine equal to any restitution fine imposed under section 1202.4, subdivision (b). Here, the abstract

16

of judgment provides for a $10,000 parole revocation fine and a $10,000 restitution fine. Those equal fines are also reflected in the court's minutes and are the fines recommended by the probation officer.

A difficulty arises because the *reporter's* transcript states that, although the trial court imposed a "$10,000" parole revocation fine, it imposed a "$1,000" restitution fine. Jimenez suggests that we remedy this conflict between the reporter's transcript and the abstract of judgment by simply amending the abstract of judgment so that it imposes a $1,000 restitution fine and a matching $1,000 parole revocation fine. (See *People v. Martinez* (2002) 95 Cal.App.4th 581, 586-587.) We decline to do so.

While the court in *People v. Martinez*, faced with a similar conflict in the record, reduced matching $3,400 restitution and parole revocation fines to matching $3,000 fines (*People v. Martinez*, *supra*, 95 Cal.App.4th at p. 586), we are unwilling to do so here largely because, in this case, that approach would reduce the fines imposed by the trial court by a factor of 10. Our hesitance to make such a drastic reduction in the fines, and potentially substantial intrusion on the trial court's actual intention, is buttressed by the fact that, although the probation officer recommended $10,000 fines and the trial court's minutes reflect the higher fines, only an absent "0" in the reporter's transcript creates any conflict. Given these circumstances, we believe the best course is to remand for the limited purpose of permitting the trial court to clarify the record with respect to the fines it intended to impose. (See *People v. Smith* (1983) 33 Cal.3d 596, 599 [conflicts between reporter's transcript and clerk's record need to be resolved on case by case basis rather

17

than application of mechanical rule favoring reporter's transcript].)

We reject Jimenez's contention he was entitled to a jury trial with respect to imposition of any fine in excess of the statutory minimum of $240. (See *People v. Kramis* (2012) 209 Cal.App.4th 346, 348-352.)

## DISPOSITION

The judgment is reversed and remanded for the limited purpose of permitting the trial court to clarify the record with respect to the restitution and parole revocation fines it intended to impose. In all other respects, the judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HALLER, J.


McDONALD, J.

18