Filed 11/30/15  P. v. Rickman CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256268 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA381108) |
| v. | |
| DESTYN ANTHONY RICKMAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. David V. Herriford, Judge.  Affirmed in part, reversed in part with directions.

Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Stephanie C. Brenan and Brendan Sullivan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Destyn A. Rickman was charged with 19 counts of various financial crimes.[1] After a jury trial, he was convicted of all charged offenses consisting of forgery (counts 1 & 2), procuring a false instrument (counts 3 & 4), grand theft (counts 5 & 6), money laundering (counts 7 through 11 and 13 through 19) and perjury (count 20). The trial court sentenced Rickman to an aggregate term of six years and four months in state prison. On appeal, Rickman contends: (1) insufficient evidence supports his convictions on counts 16 and 17, (2) the trial court erroneously imposed the white collar enhancement sixteen times instead of once, and (3) the trial court improperly imposed separate punishments for grand theft and forgery. The Attorney General concedes error on the imposition of multiple white collar enhancements but contests the remaining grounds. We agree with Rickman insufficient evidence supports the convictions on counts 16 and 17. We further agree the trial court committed error by imposing the white collar enhancement more than once. We, however, find the trial court properly imposed separate sentences for forgery and grand theft. Therefore, we reverse Rickman's convictions on counts 16 and 17 and order the sentence modified on the multiple imposition of the white collar enhancements. We otherwise affirm the judgment as modified.

## FACTS AND PROCEDURAL HISTORY

### *The "Theft" and Sale of the Family House — Counts 1 through 6*

Rickman and co-defendant Rachel Morales orchestrated a fraudulent transfer of a residential property located in the city of Pasadena. The legal title to the property was in

---

[1] Rickman was charge in the Amended Information as follows: counts 1 and 2 - Penal Code section 470, subdivision (a) [forgery], counts 3 and 4 - Penal Code section 115, subdivision (a) [procuring and offering a false or forged instrument], counts 5 and 6 - Penal Code section 487, subdivision (a) [grand theft], counts 7 through 11 and 13 through 19 - Penal Code section 186.10, subdivision (a) [money laundering], and count 20 - Penal Code section 118, subdivision (a) [perjury]. Rickman was also charged with two special allegations: Penal Code section 186.11, subdivision (a) [white collar penalty enhancement - applicable to all counts except on perjury], and Penal Code section 186.10, subdivision (c)(1)(b) [money laundering penalty enhancement].

2

the name of Francisca Abalos[2] who died intestate in 1983. Her grandson, Randolph Abalos, lived in the residence and had moved there soon after her death. The family apparently took no action to change record title to the property. For several decades, Randolph lived in the home without problem. Things changed when his sister, Lucinda Debill, and her boyfriend, Robert Simon, moved in.

In April 2008, Randolph and Lucinda received a visit from Morales.[3] Claiming she worked for the City of Pasadena's "Nash Program," Morales indicated she could assist Randolph in obtaining funds to repair the property. When Randolph told Morales the house remained in his deceased grandmother's name, Morales stated she had connections and could work something out to get money out of the property.

Suspicious, Randolph researched the claims made by Morales. He learned the "Nash Program" did not exist. When Morales called Randolph a few days later, he told her of his findings, that he did not want her services, and that he would call the police if she came back to the property. Undeterred, Morales called Randolph a short time later and said she was sending an appraiser to his home. He told her again he would contact the police.

A few months later, Randolph found his sister, Lucinda, talking with an appraiser and Rickman. Shortly thereafter, a letter from the county recorder's office came in the mail addressed to Lucinda. The letter indicated on April 28, 2009, Francisca signed a grant deed transferring ownership of the property to Lucinda.[4]

Randolph tried to prevent Lucinda from selling the family home. He successfully recorded a mechanic's lien against the property. He later learned a signed release of the lien was executed on May 16, 2008. At trial, Randolph testified that his signature on the release was forged.

---

[2] We hereafter use the first names of the members of the Abalos family for sake of clarity.

[3] She is not a party to this appeal.

[4] Francisca died more than 20 years before she purportedly signed the grant deed.

Despite Randolph's efforts, Lucinda "sold" the house, and received money as a result of the sale. Lucinda left the family home in late April 2008. At the time of the trial, Randolph had not spoken with Lucinda since her departure.

One day, Rickman and Andre Avery, the buyer, showed up at the house and said they were there to do repairs. Randolph told the two men they stole his house and showed them his attorney's card. The men took the card and left. Later, Randolph filed a civil lawsuit to settle the title issues on the property.[5]

### *The Money Laundering of the Proceeds from the Sale — Counts 7-11, 13-19*

Approximately a year and a half before these events, Rickman opened an account for DR Investment, Inc. (DR) at Comercia Bank. Rickman was the only signer on the account. On June 4, 2008, the balance in DR's account was $49.37. The next day, an electronic deposit in the amount of $133,910.47 was made from First National Escrow to DR's account (count 7). Later the same day, a second electronic deposit was made in DR's account from First National Escrow to DR's account in the amount of $80,000 (count 8).

In the next several weeks, Rickman made a series of withdrawals from DR's account as follows:

June 5, 2008 in the amount of $45,000 (count 9);

June 5, 2008 in the amount of $10,000 (count 10);

---

[5]    Avery appears also to have been a victim of fraud in connection with the sale of the house. Rickman represented himself as a real estate agent who could help Avery find a property to purchase. Rickman showed Avery the property and said it was selling for about $300,000. Rickman offered to front a $70,000 down payment. When Avery and Rickman went to a credit union for the $70,000 down payment, Rickman only had $59,000 and Avery gave Rickman $11,000 by in a cashier's check to complete the $70,000. Rickman thereafter helped Avery obtain a loan from Countrywide for $296,000, secured by a deed of trust, and in opening an escrow account. On May 28, 2008, Avery received a grant deed from Lucinda Debill conveying the property to Avery. The proceeds from the sale transaction were distributed as follows: a $55,000 payment to "Roos Technology"; $133,910.47 to DR Investment; $80,000 to DR Investment; and $80,000 to Lucinda Debill. After the sale transaction was complete, Rickman found ways to keep Avery from seeing the property. Ultimately, Avery did not get the property and was refunded his $11,000 portion of the down payment from an insurance company.

4

June 5, 2008 in the amount of, $8,000 (count 11);

June 6, 2008 in the amount of $35,000 (count 13);

June 6, 2008 in the amount of $12,040 (count 14);

June 9, 2008 in the amount of $30,000 (count 15);

June 10, 2008 in the amount of $5,000 (count 16);

June 11, 2008 in the amount of $5,000 (count 17);

June 17, 2008 in the amount of $10,000 (count 18);

June 20, 2008 in the amount of $30,000 (count 9).

*The Criminal Prosecution*

The information was filed on July 2, 2012. It jointly charged Rickman and Morales with six counts related to the fraudulent acquisition and sale of the property. In addition, Rickman was charged with 12 counts of money laundering under Penal Code section 186.10, subdivision (a). Each count expressly identified the dollar amount of the transaction as listed above.[6]

The case was tried to a jury in July 2013. During the trial, the parties discussed the jury instructions with the trial court. On the offense of money laundering, the prosecutor requested the trial court to give CALCRIM No. 2997 alternative 2C.[7] Ultimately, the trial court instructed the jury on the money laundering charges using CALCRIM No. 2997 as follows: "The defendant is charged in counts 7 through 11 and 13 through 19 with money laundering. To prove that the defendant is guilty of this crime the People must prove that: One, the defendant conducted one or more financial transaction[s] involving at least one monetary instrument through at least one financial institution; two, the defendant conducted the financial transactions within a 30-day period and the monetary instrument involved had a total value of more than $25,000. And, three, the defendant knew that the monetary instrument represented the proceeds of

---

[6]     All further undesignated section references are to the Penal Code.

[7]     The alternate instructions under CALCRIM No. 2997 are discussed below in more detail in addressing the issues on appeal.

5

criminal activity or was derived directly or indirectly from the proceeds of criminal activity." On July 22, 2013, the jury returned verdicts finding Rickman guilty of all counts.

## DISCUSSION

### I.     Sufficiency of the Evidence on Counts 16 and 17

Rickman contends the evidence is not sufficient to support his money laundering convictions for counts 16 and 17. We agree.

In assessing a claim of insufficiency of evidence, the reviewing court's task is to "review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

 Section 186.10, subdivision (a), reads: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($5,000), or a total value exceeding twenty-five thousand dollars ($25,000) within a 30-day period, through one or more financial institutions . . . is guilty of the crime of money laundering."

Section 186.10, subdivision (b), reads: "Notwithstanding any other law, for purposes of this section, each individual transaction conducted in excess of five thousand dollars ($5,000), each series of transactions conducted within a seven-day period that total in excess of five thousand dollars ($5,000), or each series of transactions conducted within a 30-day period that total in excess of twenty-five thousand dollars ($25,000), shall constitute a separate, punishable offense."

Harmonizing the two sections, the crime of money laundering may be prosecuted under three different theories of liability: (1) any single transaction exceeding $5,000 (CALCRIM alternative 2A), (2) series of transactions within a 7-day period which together exceed $5,000 (CALCRIM alternative 2B), and (3) series of transactions within

6

a 30-day period which together exceed $25,000 (CALCRIM alternative 2C).[8] Each alternative constitutes a separately punishable offense.

In the instant case, confusion resulted from the following circumstances: the jury instructions given to the jury (CALCRIM alternative 2C) were not consistent with the money laundering counts as filed (CALCRIM alternative 2A). We requested supplemental letter briefs from the parties to address this apparent confusion. In response, defendant modified his original position and asked we find additional counts not supported by sufficient evidence.[9]

Untangling this confusion requires we review: (1) the prosecutor's filing discretion, (2) the evidence presented, (3) the verdict forms, and (4) the final jury instructions given to the jury.

*Filing Discretion*

It is well settled the discretion to file a criminal case rests solely in the executive branch. "Although codified by statute in Government Code sections 26500 and 26501, the principle of prosecutorial discretion is rooted in the separation of powers and due process clauses of our Constitution, and is basic to our system of criminal justice:

---

[8]    On element 2, CALCRIM No. 2997 provides three alternatives corresponding to the options under section 186.10, subdivision (b). They are:

"2A.    The financial transaction involved [a] monetary instrument[s] with a total value of more than $5,000;

2B.    The defendant (conducted/ [or] attempted to conduct) the financial transactions within a seven-day period and the monetary instrument[s] involved had a total value of more than $5,000;
[OR]

2C.    The defendant (conducted/ [or] attempted to conduct) the financial transactions within a 30-day period and the monetary instrument[s] involved had a total value of more than $25,000."

[9]    In his opening brief, defendant contended counts 16 and 17 were not supported by sufficient evidence. He conceded, "the other counts stand alone as convictions in their own right." Based on the request for supplemental briefing which suggested the possibility additional counts might not be supported by sufficient evidence, he now asserts additional counts (10, 11, 14, and 18) are not supported by sufficient evidence.

'The decision as to appropriate charges is a matter of prosecutorial discretion. "[P]rosecutorial discretion is *basic to the framework of the California criminal justice system.* [Citations.] This discretion, though recognized by statute in California, is founded upon constitutional principles of separation of powers and due process of law." ' [Citations.] 'The district attorney's function is quasi-judicial in nature [citation], and . . . he is vested with discretionary power in determining whether to prosecute in any particular case. *An unbroken line of cases in California* has recognized this discretion and its insulation from control by the courts. . . .' [Citation, italics added.]" (*Gananian v. Wagstaffe* (2011) 199 Cal.App.4th 1532, 1543.)

In looking at the charging document, it is evident the prosecutor filed the money laundering counts as separate crimes. Each count lists a dollar amount at or over $5,000 and separately itemizes the potential impact of punishment. This evinces the prosecutor's choice to file each alleged money laundering transaction as a separate crime.

*Evidence Presented*

During its case in chief, the prosecutor called Armen Martirosyan to the witness stand to prove the money laundering counts. Martirosyan is an assistant banking center manager for Comerica Bank where Rickman kept his account. He testified DR Investment, Inc. opened a business checking account on September 7, 2006. The sole authorized signer was "Destyn Rickman." Martirosyan reviewed bank records and testified concerning a series of transactions made on the DR Investments, Inc. account from June 1, 2008 to June 30, 2008. His testimony on each transaction, both deposits and withdrawals, matched the dollar amount listed for counts 7 through 11, and 13 through 19.

*Verdict Forms*

The verdict form for count 7, the first of the series of identical verdict forms on the money laundering counts stated:

"We, the jury in the above-entitled action, find the defendant, Destyn Rickman,

Guilty of the crime of MONEY LAUNDERING, to wit a value exceeding $133,910.47, in violation of Penal Code section 186.10(a), a Felony, as charged in Count Seven of the Information.

We, further find the allegation that in commission of the above offense, the value of transaction or transactions exceeded One Hundred Fifty Thousand Dollars ($150,000) but less than One Million Dollars ($1,000,000) within the meaning of Penal Code Section 186.10(c)(1)(b) to be:

_____

True or Not True"

Each verdict form for the money laundering counts followed this format. The only difference was in the dollar amount for the separate counts itemized in the information.

A jury often makes findings of fact when rendering a general verdict.[10] For example, a jury may be asked to find a defendant guilty of first as opposed to second degree murder, or of first degree burglary. In determining what the jury has done, we look at the content in the verdict form to determine whether the jury has specified the required information. (*People v. San Nicholas* (2004) 34 Cal.4th 614, 634-635.)

In the instant case, the verdict forms for the money laundering counts specified the dollar amounts for each transaction corresponding to each count. The jury found the defendant guilty on each of the money laundering counts which specified the dollar amount for that transaction. From this, we find the jury made specific findings as to the dollar value of each corresponding count.

*Final Jury Instruction*

For the money laundering counts, the trial court instructed the jury in relevant part as follows:

"To prove that the defendant is guilty of this crime, the People must prove that:

---

[10]    "A general verdict upon a plea of not guilty is either 'guilty' or 'not guilty' . . . ." (Pen. Code, § 1151.)

1.     The defendant conducted one or more financial transactions involving at least one monetary instrument through at least one financial institution:

2.     *The defendant conducted the financial transaction within a 30-day period and the monetary instruments involved had a total value of more than $25,000;*

AND

3.     The defendant knew that the monetary instrument represented the proceeds of criminal activity or was derived directly or indirectly from the proceeds of criminal activity."  (Italics added.)

In the instant case, the trial court ultimately instructed the jury under alternative 2C.  This was clearly contrary to the manner the money laundering counts were filed.  If the prosecutor's original intent was to file the various charges under CALCRIM alternative 2C, the transactions with a dollar value of less than $25,000 would have been aggregated into one, or at most, a few counts.  This is not how the prosecutor exercised its executive discretion.  Instead, it is evident each count was filed as a separate crime under CALCRIM alternative 2A.

We are mindful, the prosecutor who argued the case to the jury may not have been of the same mind.[11]  However, after analyzing the filing discretion originally exercised, the evidence presented, the verdict forms used, and the final instruction given to the jury, we conclude the confusion was caused by instructional error.  Here, the trial court should have used CALCRIM alternative 2A instead of CALCRIM alternative 2C to instruct the jury.

---

[11]     The prosecutor's closing argument discloses inconsistencies of understanding.  She argued each count as a separate offense (counts 10, 11, 14, 16, 17 and 18 were all under $25,000 standing alone), yet she relied on CALCRIM alternative 2C to prove her case.

"A jury instruction that omits an element of an offense requires reversal unless the error was harmless beyond a reasonable doubt. [Citation.] However, if no rational jury could have found the missing element unproven, the error is harmless beyond a reasonable doubt. [Citation.]" (*People v. Nicholson* (2004) 123 Cal.App.4th 823, 833.)

The missing instruction (CALCRIM 2A), would have told the jurors to determine whether the transaction corresponding to the count alleged was a total value of more than $5,000. This was clearly proven for counts 7 ($133,910.47), 8 ($80,000), 9 ($45,000), 10 ($10,000), 11 ($8,000), 13 ($35,000), 14 ($12,040), 15 ($30,000), 18 ($10,000) and 19 ($30,000). The jury found each of the amounts as listed in the general verdict form through their guilty verdicts. As to the above referenced counts, we are convinced beyond a reasonable doubt the error was harmless.

This, however, does not resolve counts 16 and 17. As to these two counts, the question regarding the sufficiency of the evidence remains. On these two counts, Martirosyan testified the withdrawals showed each transaction was "$5,000." No other evidence addressed the dollar value on these two counts. The prosecution did not prove the amount exceeded $5,000 as required by section 186.10, subdivision (b).

Respondent argues *People v. Mays* (2007) 148 Cal.App.4th 13 (*Mays*), stands for the proposition that the term used in the statute, " 'total value exceeding five thousand dollars' " does not mean more than $5,000. (*Id.* at p. 30.) Respondent posits, *Mays* is properly understood to have interpreted section 186.10, subdivision (a) as requiring proof that the amount *equaled*, not exceeded, $5,000.

We do not read *Mays* in this way. The precise issue presented in *Mays* related to a jury's question on how much of the $5,000 needed to be spent on criminal activity. In other words, the gist of the jury's question was not about the total amount necessary to prove the crime, but rather whether the entire amount needed to be spent for criminal activity. (*Mays, supra*, at p. 36.)

In rejecting respondent's argument, the *Mays* court first relied on the doctrine of invited error as the defendant agreed to the answer the trial court gave. Furthermore, *Mays* went on to explain the trial court's response was correct by noting, "The court's

11

response . . . properly addressed the jury's question as to whether the '$5,000 has to be spent on criminal activity' by focusing the jury's attention on the alternate intent requirements." (*May, supra,* at p. 37.) *Mays* was not focused on interpreting the terms of the statute at issue here.

In any event, we think the plain reading of the statute controls. When interpreting statutory language, "[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 79.) Under the "plain meaning" rule, "[t]he court looks first to the language of the statute; if clear and unambiguous, the court will give effect to its plain meaning." (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 223.) "But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. [Citation.] Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)

The plain meaning of the words "total value exceeding five thousand" is obvious. It means more than $5,000. It does not mean equal to $5,000. Thus, the prosecution was required to prove the dollar amounts involved in counts 16 and 17 exceeded $5,000. This, they have not done. Defendant is correct - insufficient evidence supports the convictions on these two counts and as such, they are reversed.

12

**II.     The Sentencing Enhancement Claim**

Rickman contends the trial court erred in imposing the aggravated white collar crime enhancement (see § 186.11 subd. (a)(1)) a total of sixteen times instead of once. The People concede the sentencing error.  We agree.

Section 186.11, subdivision (a)(1), provides in pertinent part:

> "Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in [this section].  This enhancement shall be known as the aggravated white collar crime enhancement.  *The aggravated white collar crime enhancement  shall only be imposed once in a single criminal proceeding. . . .*"  (Italics added.)

In Rickman's current case, the trial court properly imposed a two-year white collar crime enhancement on count 6, the base term.  However, the court also imposed an eight-month white collar crime enhancement as a subordinate term on count 3 (one-third of the two-year section 186.11, subdivision (a) enhancement), and also imposed concurrent two-year white collar crime enhancements on counts 1, 4, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, and 19.  Because the white collar crime enhancement statute expressly provides the enhancement can only be imposed once in a single criminal proceeding, we strike the imposition of the enhancement on counts 1, 3, 4, 7, 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, and 19.  This will reduce Rickman's aggregate sentence by eight months, the term for the enhancement imposed on count 3.

### III. The Section 654 Sentencing Claim

Rickman contends the trial court properly imposed the punishment on count 6 for grand theft, but improperly imposed a concurrent term on count 1 under the proscription against double punishment provided in section 654. Rickman argues this is so because his criminal act of forgery (count 1) was incidental to the one objective of stripping the home of equity (count 6). We disagree.

Section 654, subdivision (a), provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." "The test for determining whether section 654 prohibits multiple punishment has long been established: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.] . . . We noted, however, that cases have sometimes found separate objectives when the objectives were either (1) consecutive even if similar or (2) different even if simultaneous. In those cases, multiple punishment was permitted. [Citation.]" (*People v. Britt* (2004) 32 Cal.4th 944, 951-952.)

In *People v. Beamon* (1973) 8 Cal.3d 625, the court explained separation of time is a factor supporting double punishment even if the defendant's aim is to accomplish a single objective. The *Beamon* court noted, "It seems clear that a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment. [Citations.]" (*Id.* at p. 639.)

We agree with the People the grand theft in count 6 and the forgery in count 1 are separate offenses with separate intents. First, the forgery occurred in April of 2008 and the grand theft, in June of 2008. Count 1 and count 6 are divisible in time. This rule makes sense. While it is not illogical to posit the general scheme here was to commit theft, it does not follow all acts done fall under the indivisible course of conduct

14

umbrella.  When significant time, as here, separates one act from the next, a person who commits multiple crimes is more culpable than a person who commits one.

*People v. Neder* (1971) 16 Cal.App.3d 846, explained the pertinent difference between the crimes of theft and forgery.  "The essential act in all types of theft is taking.  If a certain amount of money or property has been taken pursuant to one plan, it is most reasonable to consider the whole plan rather than to differentiate each component part.  [Citation.]   The . . . crime of forgery, however, is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud."  (*Id.* at pp. 852-853.)

The intent for the fraud in count 1 was to deceive the government, the banks, and the unsuspecting buyer, that the grant deed was legitimate.  This is to be distinguished from the intent under the divisible act for count 6, to commit theft.  The trial court properly imposed a separate sentence on counts 1 and 6.

### DISPOSITION

The judgment is reversed as to counts 16 and 17.  The white collar crime enhancements imposed on counts 1, 3, 4, 7, 8, 9, 10, 11, 13, 14, 15, 18, and 19 are stricken.  The trial court is directed to prepare an amended abstract of judgment showing these modifications.  The trial court is ordered to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.


OHTA, J.[*]

We concur:


RUBIN, Acting P.J.                    GRIMES, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15