Filed 4/4/17; part. pub. & mod. order 5/2/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>    **Plaintiff and Respondent,**<br><br>**v.**<br><br>**LEWIS ERVING LEE,**<br><br>    **Defendant and Appellant.** | **A145038**<br><br>**(San Mateo County**<br>**Super. Ct. No. SC080320**) |

A jury convicted Lewis Erving Lee of 77 felonies, including multiple counts of grand theft (§ 487, subd. (a)), elder theft (§ 368, subd. (d)(1)), identity theft (§ 530.5, subd. (a)), and money laundering (§ 186.10).[1] The court sentenced Lee to 15 years in state prison and ordered him to pay over $1.3 million in victim restitution (§ 1202.4).

Lee appeals. He contends there was insufficient evidence to support the money laundering convictions, the identity theft convictions, and two elder theft convictions. Lee argues we should reverse all but one of the grand theft convictions against each victim or set of victims. Also, Lee asserts we should modify the restitution order and amend the judgment.

We affirm in part and reverse in part. We reverse four of the money laundering convictions based on insufficient evidence. We reverse the identity theft convictions because there is no evidence Lee used his victims' personal identifying information for

---

[1]    Unless noted, all further statutory references are to the Penal Code.

1

an unlawful purpose without their consent.  We reverse two elder theft convictions because the Attorney General concedes there was insufficient evidence to support them. We conclude Lee should not have to pay restitution to one set of victims, and the trial court should amend the judgment to correct the amounts of certain fees.  In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We provide a brief overview of the facts here, and additional factual and procedural details in the discussion of Lee's specific claims.  The People charged Lee with 78 felonies: one count of first degree burglary (§ 460, subd. (a)), 22 counts of grand theft (§ 487, subd. (a)), six counts of elder theft (§ 368, subd. (d)(1)), 20 counts of identity theft (§ 530.5, subd. (a)), 11 counts of money laundering (§ 186.10), 17 counts of fraudulent sale of a security (Corp. Code, § 25401), and one count of securities fraud (Corp. Code, § 25541).

Lee, who has a degree in business administration, began a tax consulting business in 1974.  Starting in the 1990's, Lee convinced many of his tax clients to invest significant amounts of money with him, telling them their funds would either be part of an "investment club" or used to purchase shares in a company called China EC Net. Instead, Lee used the money for personal needs, including payment of mortgage obligations, living expenses, and his daughter's medical costs.  When a San Mateo police officer arrested Lee in 2012, Lee said "you have no idea how big this is" and admitted "I know I was wrong for what I've done."

A.      China EC Net

Lee became involved with China EC Net through one of his tax clients, who was the company's corporate secretary from 1998 to 2001 and its chief executive officer around 2001.  China EC Net listed Lee as its chief financial officer in 2000, but a company founder testified he did not believe Lee spent a lot of time working for the company.  Lee's financial problems derived from "bet[ting] the farm" on China EC Net going public, which never occurred.

2

In February 2000, China EC Net granted Lee options to purchase 10,000 shares of common stock. In August 2006, Lee exercised the options and purchased the shares for $650. Those were the only shares Lee ever purchased. In April 2008, Lee received another 50,000 shares as a gift. China EC Net issued Lee stock certificates documenting his ownership of 60,000 shares.

Lee testified that, in February 2000, the company awarded him an additional 500,000 options, and that he exercised them, but there is no stock certificate showing Lee's purported ownership of these shares. A company founder testified the grant could not have occurred without his knowledge. Lee stated he was granted and exercised another 250,000 options in 2007, but Lee received no documentation regarding this purported exercise of options.

China EC Net's stock options were not transferable, except by will or the law of descent, and only the option holder could exercise them. Anyone who wanted to transfer shares had to give notice to the company, which had the right of first refusal to purchase the shares. Lee understood China EC Net had a right of first refusal. Lee devised a plan to hold the shares in trust for his clients to avoid this problem. Lee never gave the company notice of his intent to sell his shares.

Lee claimed he owned 810,000 shares, and his records indicate he "sold" 733,000 option shares. China EC Net does not recognize as shareholders any of the persons to whom Lee purportedly sold shares.

B.     The Investment Clubs

In addition to selling shares in China EC Net, Lee admitted taking money from many of his tax clients, but not investing it as promised. Lee started an investment club in May 1991. The concept was that club members would invest funds that Lee would pool and use to buy stocks. Lee set up a portfolio based on the money provided and created reports for his clients showing their returns, but he used the money for personal needs. Lee convinced tax clients to join three different investment clubs. If clients wished to withdraw funds, Lee often used money obtained from other investors to cover the withdrawals.

3

C.    Verdict and Sentence

The prosecution dismissed one count of elder theft, and a jury convicted Lee of 77 counts consisting of the following: one count of burglary (§ 460, subd. (a)), 22 counts of grand theft (§ 487, subd. (a)), five counts of elder theft (§ 368, subd. (d)(1)), 20 counts of identity theft (§ 530.5, subd. (a)), 17 counts of fraudulent sale of a security (Corp. Code, § 25401), 11 counts of money laundering (§ 186.10), and one count of securities fraud (Corp. Code, § 25541).  The court sentenced Lee to 15 years in state prison, and ordered him to pay $1,345,274.67 in restitution.

DISCUSSION

I.

*There Was Sufficient Evidence to Support Seven of the Money Laundering Convictions,*
*but Insufficient Evidence to Support Four of Them*

Lee contends insufficient evidence supports his money laundering convictions. Section 186.10, subdivision (a) prohibits conducting transactions through financial institutions "involving a monetary instrument or instruments" exceeding $5,000 within a seven-day period, or $25,000 within a 30-day period, "(1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity . . . ."  Thus, the statute criminalizes two different types of activity: promoting criminal activity, and engaging in transactions with the proceeds of criminal activity.  The Attorney General labels the statute's two prongs the "promoting prong" and the "transactional prong."[2]

"Monetary instrument" means "United States currency and coin" and it includes "any personal check . . . in bearer form or otherwise in a form in which title thereto passes upon delivery."  (§ 186.9, subd. (d).)  "Monetary instrument" does not include

---

[2]    The jury instruction on money laundering stated the prosecution had to prove "[t]he defendant knew that the monetary instruments represented the proceeds of criminal activity."  In other words, the prosecution focused on what the Attorney General calls the "transactional prong" of the statute.

4

"personal checks made payable to the order of a named party which have not been endorsed or which bear restrictive endorsements, and also does not include personal checks which have been endorsed by the named party and deposited by the named party into the named party's account with a financial institution." (*Ibid.*)

A.    Whether Lee's Use of Personal Checks Were Transactions Involving Monetary Instruments

On appeal, Lee contends there was insufficient evidence he conducted transactions involving monetary instruments.[3] Lee's victims wrote personal checks to him, which he deposited into his bank account. But a personal check deposited by a payee into the payee's account is not a " 'monetary instrument' within the meaning of section 186.9, subdivision (d)." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1100 (*DeVaughn*).) Applying this exclusion, Lee argues his deposits in counts 67 to 77 inclusive were not transactions involving "monetary instruments." Therefore Lee contends there was insufficient evidence to support his money laundering convictions.

Preliminarily, we are not persuaded by Lee's focus on his *deposits*. A "transaction" includes withdrawing money from a bank account. (§ 186.9, subd. (c) [transaction includes "the deposit, withdrawal, . . . or exchange of currency, or a monetary instrument . . ."]; *People v. Mays* (2007) 148 Cal.App.4th 13, 22 (*Mays*) ["A transaction includes a deposit into or withdrawal from a financial institution"].) Lee's acts of withdrawing money could be "transactions" within the meaning of the money laundering statute. In its closing arguments, the prosecution told the jury "to look at where the investor money is going when it leaves Mr. Lee's account."

We consider, then, whether Lee's acts of withdrawing money by writing personal checks against funds Lee obtained from his victims were transactions involving "monetary instruments" in violation of section 186.10, subdivision (a). The Attorney General acknowledges Lee may have withdrawn some money by writing personal checks

---

[3]    During deliberations, the jury sought clarification regarding the definition of "monetary instrument," noting it excluded certain kinds of personal checks. The court responded: "The definition is what it is." The jury convicted Lee of all the money laundering charges.

5

because prosecution exhibits 24 and 27 — spreadsheets showing Lee's deposits and withdrawals — list check numbers next to some of the withdrawals.[4] The Attorney General then states "[i]t is unclear if these check numbers relate to personal checks written by the payor and deposited by the payee into the payee's account; the issue was not developed below by either party." Nevertheless, the Attorney General argues "the fundamental monetary instrument . . . remains the stolen money in [Lee's] bank account." Relying on *People v. Conners* (2008) 168 Cal.App.4th 443 (*Conners*), the Attorney General argues that "transactions involving stolen money constitute money laundering, even if a personal check was used as a subsequent or secondary instrument to transfer that currency out of an account."

We disagree with the Attorney General's premise that Lee's acts of withdrawing money by writing personal checks were transactions criminalized by section 186.10, subdivision (a) simply because Lee wrote the personal checks against funds he stole from his victims. We are not at liberty to focus only on the source of the funds where Lee's withdrawals are the relevant transactions, where many of the withdrawals were by check, and where the statute does not criminalize all transactions involving personal checks. While the definition of "monetary instrument" includes personal checks in bearer form, it excludes other kinds of personal checks. (§ 186.9, subd. (d).)

For this reason, the Attorney General's reliance on *Conners* is misplaced. The defendant in *Conners* used checks to obtain cash. (*Conners*, *supra*, 168 Cal.App.4th at p. 450.) For one check, someone lined out the defendant's name and replaced it with "Cash." (*Ibid.*) There was no issue regarding whether the checks were "monetary instruments" because "cash was paid out to the endorser." (*Ibid.*) But most of the checks

---

[4]    The Attorney General moved to augment the record to include numerous prosecution exhibits, including exhibits 24 and 27. Lee opposed the motion claiming the trial court did not admit the exhibits into evidence. Lee is incorrect; the exhibits were admitted. We partially grant the motion to augment and augment the record to include prosecution exhibits 24, 27, 82, 90, 98, 136-140, 146, 147, 188, 191, 268, 280 and 281. On our own motion, we augment the record to include prosecution exhibits 108, 110, 219 and 220. (Cal. Rules of Court, rules 8.155(a), 8.340(c).)

6

Lee wrote — as shown by exhibits 24 and 27 — were not in bearer form; instead, they typically list the names of specific payees. There is no evidence as to whether the payees endorsed them and deposited them into their bank accounts. In short, the prosecution did not prove these checks were monetary instruments as defined in section 186.9.

In *DeVaughn*, the court reversed money laundering convictions because the transactions involved personal checks. (*DeVaughn*, *supra*, 227 Cal.App.4th at pp. 1100-1101.) One conviction was based on a transaction involving a personal check made payable to a defendant's company, and the defendant deposited the check into the company's account. (*Id.* at pp. 1098, 1100.) Three other convictions involved personal checks payable to, and endorsed by, third party payees. (*Id.* at pp. 1100-1101.) The court concluded these transactions did not involve a "monetary instrument" within the meaning of section 186.9, subdivision (d). (*Ibid.*)

The Attorney General argues Lee's reliance on *DeVaughn* is misplaced because the *DeVaughn* defendants were convicted of promoting criminal activity by depositing personal checks, whereas here the issue is whether Lee violated the second "transactional prong" of the statute by spending large sums of stolen money. But the definition of "monetary instrument" applies to both the transactional and the promotional prong of the money laundering statute. Under both prongs, the prosecution must prove the defendant conducted transactions involving "a monetary instrument or instruments." (§ 186.10, subd. (a).) For the checks Lee wrote, if the payees endorsed and deposited them into their bank accounts, then they were not transactions involving monetary instruments.

According to the Attorney General, it would "contravene the intent of the Legislature and the purpose of the money laundering statute if [Lee's] conduct did not constitute money laundering simply because a personal check might have been involved as a secondary monetary instrument, used to convey stolen United States currency out of appellant's account." The Attorney General contends it would "lead to absurd, inconsistent results if [Lee] committed money laundering when he transferred the stolen money directly out of his account using a wire or electronic transfer, but not when he transferred the stolen currency out of his account using a personal check."

7

Neither the Attorney General nor Lee discuss the statute's legislative history. After conducting our own review, we conclude the Legislature intended the result the Attorney General characterizes as "absurd" or "inconsistent." In 1992, the Legislature amended the money laundering statute to expand its scope. (Assem. Bill No. 3716 (1991-1992 Reg. Sess.) Ch. 672, § 1, at pp. 2874-2876; Legis. Counsel's Dig., Assem. Bill No. 3716 (1991-1992 Reg. Sess.), 1992 Summary Dig., p. 252.) According to the bill's author, the amendments would "plug loopholes in existing law which permit money laundering by way of electronic and wire transfers and by the use of a personal check made out to 'cash.' " (Sen. Com. on Judiciary, Assem. Bill No. 3716 (1991-1992 Reg. Sess.) as amended May 16, 1992, p. 3.)

Before the amendment, "transaction" did not include electronic or wire transfers. (1992 Deering's Adv. Legis. Service 672, p. 2.) "Monetary instrument" did not include personal checks, although it did include "bank checks, cashier's checks, traveler's checks, and money orders in 'bearer form' or otherwise in such form that title passes upon delivery (e.g., a check or money order made payable to 'cash')." (Sen. Com. on Judiciary, Assem. Bill No. 3716 (1991-1992 Reg. Sess.) as amended May 16, 1992, p. 2.) The 1992 bill amended the definition of "transaction" to include electronic and wire transfers, and it sought to "[r]edefine the term 'monetary instrument' to also include bank transfers or personal checks which are in bearer form or otherwise in such form that title passes upon delivery. Bank checks, traveler's checks or personal checks made payable to a named party which have not been endorsed or which bear restrictive endorsements are not included in the definition." (*Id.* at pp. 2-3.) The amendments did not include "[p]ersonal checks made payable to the order of a named party, as specified." (Assem. Com. on Public Safety, Assem. Bill No. 3716, (1991-1992 Reg. Sess.), p. 2.) The amendments expanded the statute to include electronic or wire transfers, and to include personal checks made payable to "cash," but the Legislature specifically excluded other kinds of personal checks from the statute's scope.

We cannot agree with the Attorney General that we can focus on the stolen money as the "primary" monetary instrument. If the prosecution's theory was that cash deposits

8

were the relevant transactions, then Lee's subsequent use of checks to withdraw funds would not be relevant to our analysis. For example, in *Mays*, the prosecution based the money laundering charges on the defendant's cash deposits into his bank account, so it was not relevant to the court's analysis that the defendant subsequently wrote checks from this account to pay rent and phone bills. (*Mays*, *supra*, 148 Cal.App.4th at pp. 20-21.) But here, the prosecution did not, and could not, rely on Lee's deposits because they were personal checks that Lee endorsed and deposited into his account. Instead, the prosecution focused on Lee's withdrawals as the pertinent transactions. Hence, we cannot ignore that many of these withdrawals were by check.

B.      Sufficient Evidence Supports Seven of the Money Laundering Convictions

For the withdrawals by check, as shown in exhibits 24 and 27, there was no testimony about what the payees did with the checks. Lee contends the jury could only speculate these transactions involved monetary instruments. A conviction cannot be based on speculation. (*People v. Raley* (1992) 2 Cal.4th 870, 891.) We agree with Lee it would be speculative to base convictions on withdrawals using personal checks that Lee made payable to specific persons or entities.

However, as a reviewing court, we are required to "review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "An appellate court must accept logical inferences that the jury might have drawn from the evidence . . . ." (*People v. Combs* (2004) 34 Cal.4th 821, 849.) If we exclude from exhibits 24 and 27 all withdrawals where a check number is listed, there remain sufficient withdrawals that exceeded $5,000 in a seven-day period or $25,000 in a 30-day period to support the charges in counts 67, 70, 71, 73, 74, 75, and 77. We briefly summarize the evidence supporting these convictions:

9

- Count 67 concerned Lee's use of funds after he deposited a $100,000 check from Cornelius G. on December 17, 2007.[5] On the same day, Lee made two non-check mortgage payments of $18,945.29 and $20,939.82. Three days earlier, Lee had deposited a $50,000 check from other investors, but his account balance was only $1,606.16 before this earlier deposit. As a result, the jury could reasonable infer Lee knew he made the two non-check mortgage payments using the proceeds of criminal activity, and the amounts exceeded $5,000 in a seven-day period.

- Count 70 concerned Lee's use of funds provided by Kathleen G. On the same day Lee deposited her $12,000 check, Lee made a non-check mortgage payment of $5,845.88. Before the deposit, Lee had only $535.84 in his bank account.

- Count 71 concerned Lee's use of funds provided by Lisa K.[6] Before Lee deposited her $50,000 check, his account balance was only $594.24. Four days later, Lee made three non-check mortgage payments totaling $16,466.96.

- Count 73 concerned withdrawals after Lee deposited two checks from Robert W. totaling $20,000. Lee had $14,254.54 in his account before the deposits, but most of this balance came from the $15,000 another investor gave Lee five days earlier. On the same day Lee deposited Robert W.'s two checks, Lee made two non-check mortgage payments totaling $12,665.47.

- Count 74 concerned Lee's use of funds provided by Patricia G. Before Lee deposited her $12,000 check, Lee's balance was $1,279.82. Over the next seven days, Lee paid some bank fees, and his non-check withdrawals totaled $9,969.48, including a mortgage payment of $6,350.47.

---

[5]  We refer to Lee's victims by first name and last initial to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(4).)

[6]  On appeal, when discussing count 71, both Lee and the Attorney General focus on Lee's use of money given by other investors around the same time, Wilbur and Jacqueline T. However, in the prosecution's closing arguments, the People relied on funds provided by Lisa K., not Wilbur and Jacqueline T., when explaining count 71 to the jury.

- Count 75 concerned Lee's use of Joan H.'s investment of $30,000. Before Lee deposited her check, his account balance was only $736.48. Two days later, Lee made a non-check mortgage payment of $6,358.47.

- Count 77 concerned withdrawals after Lee deposited a $15,000 check from Sharon H. in January 2012. Before the deposit, Lee's balance was only $132.45. On the same day, Lee made two non-check mortgage payments totaling $11,627.94.

In his reply brief, Lee does not address this evidence, but argues more generally that where it was not clear "whether or not certain payments were made by check or how any checks were processed," then the prosecution did not prove Lee used "monetary instruments" as defined in section 186.9, subdivision (d). Accordingly, he reasons we should reverse all the money laundering convictions. But Lee's non-check withdrawals clearly constitute transactions involving monetary instruments and Lee does not suggest otherwise. There was sufficient evidence Lee knew his non-check withdrawals represented the proceeds of criminal activity. (§ 186.10, subd. (a).) Evidence of Lee's non-check withdrawals, as outlined above, provides sufficient evidence to support seven money laundering convictions.

### C. There Was Insufficient Evidence To Support Four Money Laundering Convictions

According to the Attorney General, if we exclude "all transactions where check numbers are also listed, counts 67, 70, 71, 73, 74, 75, and 77 would not be impacted." In other words, the evidence of non-check withdrawals was still sufficient to support the convictions under those counts. But this statement implies counts 68, 69, 72, and 76 are "impacted" and that the prosecution did not prove money laundering under these four counts. As explained above, we must exclude the withdrawals where Lee wrote checks to payees because the jury could not reasonably infer those transactions involved a "monetary instrument."

Having reviewed the non-check withdrawals used to support counts 68, 69, 72, and 76, the evidence was not sufficient to show Lee engaged in transactions involving monetary instruments that exceeded $5,000 in seven days, or $25,000 in 30 days,

11

knowing the monetary instruments represented the proceeds of criminal activity.[7] (§ 186.10, subd. (a).) We reverse the money laundering convictions as charged in counts 68, 69, 72, and 76.

## II.

### *The Evidence Does Not Support Lee's Identity Theft Convictions*

The jury found Lee guilty of 20 counts of identity theft. The identity theft statute provides: "Every person who willfully obtains personal identifying information . . . of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, is guilty of a public offense . . ." (§ 530.5, subd. (a).) Personal identifying information includes "any name, address, telephone number, . . . demand deposit account number, savings account number, checking account number, . . . unique electronic data including information identification number assigned to the person, address or routing code, . . . or an equivalent form of identification." (§ 530.55, subd. (b).)

"The elements of the crime . . . may be summarized as follows: (1) that the person willfully obtain personal identifying information belonging to someone else; (2) that the person use that information for any unlawful purpose; and (3) that the person who uses the personal identifying information do so without the consent of the person whose personal identifying information is being used." (*People v. Barba* (2012) 211 Cal.App.4th 214, 223 (*Barba*).) Lee challenges the sufficiency of the evidence for all three elements of the crime. We are not persuaded by Lee's first argument, but Lee is correct when he argues there was insufficient evidence to satisfy the second and third elements. Accordingly, we reverse the identity theft convictions.

---

[7] The court reviewed the deposits and withdrawals as listed in prosecution exhibits 24 and 27. The relevant sections are pages 7-8, 29-31, and 104-105 of prosecution exhibit 24, and pages 2-3 of prosecution exhibit 27.

A.    There Was Sufficient Evidence Lee Willfully Obtained His Victims'
       Personal Identifying Information

First, Lee contends he did not willfully obtain his victims' personal identifying information because his intent was to obtain their money, not their information. Lee's victims wrote him checks or wired funds to him. Lee contends obtaining their information was merely a "byproduct" of how he obtained their money.

We disagree with this argument. Use of the word "willfully" in subdivision (a) of section 530.5 "implies simply a purpose or willingness to commit the act." (*In re Rolando S.* (2011) 197 Cal.App.4th 936, 941; *People v. Lewis* (2004) 120 Cal.App.4th 837, 852 (*Lewis*); § 7, subd. (1).) It implies "no evil intent but means the person knows what he or she is doing, intends to do it and is a free agent." (*Lewis, supra*, 120 Cal.App.4th at p. 852.) Lee convinced his victims to write him checks or wire money to him, which resulted in Lee willfully obtaining their personal identifying information, including checking account numbers. This evidence was sufficient to satisfy the first element of the crime. (*In re Rolando S., supra*, 197 Cal.App.4th at pp. 941-942 [defendant willfully obtained victim's password even though he was recipient of unsolicited text message containing the password].)

B.    There Was No Evidence Lee Used His Victims' Information for Any
       Unlawful Purpose

Lee next challenges the sufficiency of the evidence of the second element, arguing that when his victims wrote him checks or wired money to him, he simply deposited the checks or accepted the wire transfers. We agree with Lee that this conduct does not constitute use of the information for an unlawful purpose.

The Attorney General argues Lee "used the personal information contained in the personal checks and wires to obtain money that allowed him to perpetuate his financial crimes for decades. The personal information was necessary in order for [Lee] to obtain the amount of money he needed in order to carry out financial crimes of this scope. As such, it was used for an unlawful purpose within the broad meaning of Penal Code section 530.5." This argument stretches the concept of use for an unlawful purpose too far. It is not illegal to deposit checks or accept wire transfers. What made Lee's conduct

13

unlawful was his failure to use his victims' money as promised. This case is not like *In re Rolando S.*, where the defendant used his victim's information to access her Facebook account and post prurient messages. (*In re Rolando S.*, *supra*, 197 Cal.App.4th at p. 939.) Where Lee simply deposited his victims' checks or accepted wire transfers, there is no evidence of an unlawful use of his victims' information.[8]

C.      There Was No Evidence Lee Used the Information Without Consent

Next, Lee argues each person who gave him a check containing personal information "expressly consented to his negotiating it and having the funds transferred into his account." We agree. "What the statute contemplates and proscribes is using someone else's personal identifying information, without consent and for purposes that include obtaining credit or goods." (*Hagedorn*, *supra*, 127 Cal.App.4th at p. 747.) There is no evidence Lee used information without consent.

Cashing checks may sometimes constitute use of another's information without consent. For example, if a defendant steals checks, fills them out, and attempts to cash them, then the defendant has used another's information without consent. (*Barba*, *supra*, 211 Cal.App.4th at p. 229.) Similarly, if a defendant attempts to cash a check made payable to another using the other's identification obtained without permission, the defendant has violated the statute. (*Hagedorn*, *supra*, 127 Cal.App.4th at p. 739.) But Lee's victims sent him checks or wired money to him intending that he would get the money. Where Lee did not use the money as promised, then he stole from his victims, but this conduct did not constitute using their information without consent.

---

[8]      Courts have interpreted section 530.5, subdivision (a), broadly. For example, it contains no requirement that the defendant hold himself out as someone else. (*Barba*, *supra*, 211 Cal.App.4th at p. 223-224.) It does not require an intent to defraud or to cause harm or loss to another. (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 741-742, 744 (*Hagedorn*).) Courts have interpreted "any unlawful purpose" to include conduct broader than crimes; for example, using a person's password to commit libel falls within the statute's purview. (*In re Rolando S.*, *supra*, 197 Cal.App.4th at pp. 943-947.) But the statute still requires use of the information for an unlawful purpose and there is no such evidence here.

14

The Attorney General argues the victims' consent was not "legally valid consent." This approach conflates the second and third elements of the crime. The issue is not whether Lee's victims consented to an "unlawful use" of their information.[9] Instead, the issue is simply whether Lee's use was without the consent of the person whose information he used. (CALCRIM No. 2040 ["To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully obtained someone else's personal identifying information; [¶] 2. The defendant willfully used that information for an unlawful purpose; [¶] AND [¶] 3. The defendant used the information without the consent of the person whose identifying information (he/she) was using"].) Where Lee's victims intended that he deposit their checks or accept their wire transfers, he did not use their information without their consent. We reverse the 20 identity theft convictions.

III.

*Sufficient Evidence Supports Lee's Grand Theft Convictions*

A number of Lee's grand theft convictions concerned the same victim or set of victims. The jury convicted Lee of two counts of grand theft for unlawful takings from Patricia B. and Peter T. (counts 26 and 27), Lucky and Marina R. (counts 40 and 41), and Robert G. (counts 46 and 48). The jury convicted Lee of three counts of grand theft for taking money from Sharon H. (counts 31, 33, and 36). Relying on the California Supreme Court's decision in *People v. Bailey* (1961) 55 Cal.2d 514 (*Bailey*), Lee contends he should have been convicted of only one count of grand theft for each of these sets of victims.

In *Bailey*, the defendant obtained multiple welfare payments by false pretenses, each of which would have constituted petty theft, but, by aggregating the amounts, she

---

[9] The Attorney General relies on a case where, in the context of discussing theft by larceny, the Supreme Court noted a department store impliedly consents to customers picking up clothing within the store, but not if the customer intends to steal the item of clothing. (*People v. Davis* (1998) 19 Cal.4th 301, 306.) But this example does not support the conclusion that the words "without the consent of that person" in subdivision (a) of section 530.5 means without the "legally valid consent" of the person. We will not read into the statute words it does not contain. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 253.)

was convicted of one count of grand theft, and the Supreme Court upheld the conviction. (*Id.* at pp. 515-516, 518-519.) The Supreme Court stated "a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Id.* at p. 519.)

In *People v. Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*), the California Supreme Court revisited the *Bailey* rule in a case concerning the manager of a motorcycle dealership who fraudulently sold 20 different vehicles, costing the dealership more than $250,000. (*Id.* at p. 735.) The jury convicted him of 20 counts of grand theft, one for each vehicle, and he appealed, claiming he should have been convicted of only one count of grand theft under the *Bailey* doctrine. (*Id.* at pp. 735-736.) The *Whitmer* Court disapproved of Court of Appeal cases that have applied the *Bailey* rule too broadly to bar multiple convictions for grand theft when the individual thefts arise from one plan or scheme, even though each theft is separate and distinct. (*Id.* at p. 740.) The *Whitmer* Court concluded "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.) However, given the long line of Court of Appeal cases "consistently [holding] that multiple acts of grand theft pursuant to a single scheme cannot support more than one count of grand theft," the court concluded that its holding was "an unforeseeable judicial enlargement of criminal liability for multiple grand thefts." (*Id.* at p. 742.) As a result, the *Bailey* rule as clarified by *Whitmer* could not constitutionally apply retroactively to the defendant in *Whitmer*. (*Ibid.*)

Lee contends that, given the dates of his offenses, we must base our decision on the law prior to *Whitmer*. We agree. The conduct underlying these convictions occurred between 2005 and 2012. We apply the *Bailey* rule as it existed before *Whitmer* because Lee's conduct predates the Supreme Court's decision. (*People v. Nilsson* (2015) 242 Cal.App.4th 1, 19 [applying *Bailey* as it existed at the time of the crimes].)

Even so, we conclude the *Bailey* rule does not require reversal of the grand theft convictions. Patricia B. and Peter T. wrote Lee separate checks for $6,000 and $35,000

16

to buy shares of China EC Net. The jury could have construed the offenses as charged in counts 26 and 27 as involving different victims. The *Bailey* doctrine applies when there are multiple takings from the same victim. (*Bailey*, *supra*, 55 Cal.2d at p. 519.) It does not bar Lee's convictions involving different victims as charged in counts 26 and 27.

With regard to Lee's thefts from Lucky and Marina R., Lee told them their June 2006 payment was for shares of China EC Net, but he told them their August 2007 payment was to join one of his investment clubs. Based on Lee's different representations, it was reasonable for the jury to conclude the offenses charged in counts 40 and 41 were separate and distinct intentional acts, and that Lee did not commit them pursuant to one intention, impulse, plan or scheme. (*People v. Jaska* (2011) 194 Cal.App.4th 971, 984 (*Jaska*) [courts apply *Bailey* rule "in the absence of any evidence from which the jury could have reasonably inferred that the defendant acted pursuant to more than one intention, one general impulse, or one plan"].)[10]

Robert G. made two payments to Lee in 2007 and 2010 for shares of China EC Net. Lee's offenses against Robert G. occurred years apart, and Lee's explanation of what he would do with Robert G.'s money changed each time. Before Robert G.'s first decision to invest, Lee said he would use the money to exercise his own stock options. But Robert G.'s second investment was based on Lee's purported need to buy additional shares from others to tip the voting balance and convince China EC Net to go public. This evidence was sufficient for the jury to infer Lee "stole various sums of money in an opportunistic manner, essentially whenever the need and/or occasion arose." (*Jaska*, *supra*, 194 Cal.App.4th at p. 985.)

The same analysis applies to Lee's thefts from Sharon H., who had money to invest after she sold a house in 2005. Lee suggested his investment club, and Sharon H.

---

[10] Lee suggests the *Whitmer* Court regarded *Jaska* as "an outlier in its application of the *Bailey* rule." But in *Whitmer*, the Supreme Court cited *Jaska* for its discussion of other Court of Appeal cases that interpreted *Bailey* too broadly. (*Whitmer*, *supra*, 59 Cal.4th at p. 739.) In *Jaska*, the court concluded the defendant was properly convicted of multiple counts of grand theft. (*Jaska*, *supra*, 194 Cal.App.4th at p. 985.) This holding is consistent with the *Whitmer* Court's analysis.

invested $75,000. Thereafter, Lee sent Sharon H. reports suggesting her investments were doing well. Based on these reports, Sharon H. contributed $15,000 in 2009 for a second investment club, and she sent Lee another $15,000 in 2011 for a third investment club. Each payment occurred years apart, Lee represented each payment was for a different investment club, and Sharon H.'s later investments were based on Lee's positive reports about the earlier investment. This evidence was sufficient for the jury to conclude each offense was a separate and distinct act, and not part of the same plan or scheme. We affirm the grand theft convictions.[11]

## IV.

### *The Evidence Was Insufficient to Support Two Elder Theft Convictions*

The jury convicted Lee of elder theft related to money he took from Sharon H., as charged in counts 34 and 37. An "elder" means any person who is 65 years of age or older. (§ 368, subd. (g).) The Attorney General concedes there was no evidence Sharon H. was 65 or older when the transactions occurred in January 2009 and December 2011. We accept the concession and reverse the convictions for elder theft as charged in counts 34 and 37.

## V.

### *The Restitution Order Must Be Modified*

---

[11] In his reply brief, Lee argues for the first time that because the jury found enhancement allegations true under section 186.11, subdivision (a)(2), then the jury must have found Lee's grand thefts arose from a common scheme or plan. Ordinarily, we do not consider arguments made for the first time in a reply brief. (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693.) Even considering the argument, Lee fails to show the jury found the grand thefts arose from one scheme or plan. Subdivision (a)(2) of section 186.11 provides for an enhanced sentence if the "pattern of related felony conduct" involves the taking of more than $500,000. But conduct can be related or similar without being part of the same scheme or plan. The statute states " 'pattern of related felony conduct' means engaging in at least two felonies that have the same *or similar* purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events." (§ 186.11, subd. (a)(1), italics added.)

Lee contends the restitution order improperly requires him to pay restitution to persons who were not victims of offenses for which he was convicted.

A.      Procedural Background

After the jury convicted Lee, the prosecution requested $1,345,274.67 in restitution.  The restitution memo noted the prosecution spoke to Mackie G. in June 2015 and, as a result of the conversation, the prosecution sought only $15,000 in restitution for Mackie and Greg G., not its initial request of $50,000.  In June 2015, the prosecution heard from Patricia M., who said she and her husband gave Lee $32,000 for shares in China EC Net in 2004 or 2005.  The memo attached paperwork supporting Patricia M.'s claim.  The prosecution also sought restitution for persons named Lee W., Lisa K., and Gary P.

At the restitution hearing, Lee submitted on the People's memo for restitution.  The restitution order included proportionate disbursements to the victims from a $26,000 trust account, and, after those disbursements, the total restitution ordered was $1,319,274.67.  The restitution order included payments to Mackie and Greg G., Patricia M., Lee W., Lisa K., and Gary P.

B.      Lee Should Not Have to Pay Restitution to Mackie and Greg G.

"It is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant *convicted of that crime.* " (§ 1202.4, subd. (a)(1), italics added.)  There is no requirement that victims receiving restitution be named in the charging document.  (*People v. Walker* (2014) 231 Cal.App.4th 1270, 1275-1276.)  However, "section 1202.4 limits the scope of victim restitution to losses caused by the criminal conduct for which the defendant sustained the conviction." (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1050; *People v. Lai* (2006) 138 Cal.App.4th 1227, 1249.)

The Attorney General argues Lee forfeited the argument he should not have to pay restitution to certain persons because he did not object below.  We are not persuaded that the argument is forfeited.  Lee's argument is that these restitution payments were statutorily unauthorized.  " '[T]he "unauthorized sentence" concept constitutes a narrow

19

exception to the general requirement that only those claims properly raised and preserved by the parties are reviewable on appeal.' " (*People v. Anderson* (2010) 50 Cal.4th 19, 26 [claim that victim restitution order was unauthorized not forfeited by failure to object below].)

Considering Lee's argument, we disagree with his challenges to most of the restitution payments. In count 78, the jury convicted Lee of violating Corporations Code section 25541, for conduct occurring between 1998 and 2012. The statute makes it a crime to employ willfully any device, scheme, or artifice to defraud in connection with the offer, purchase, or sale of a security. (Corp. Code, § 25541.) At trial, the prosecution presented evidence that Lee defrauded Lee W., Lisa K., and Gary P. because they gave Lee money for shares of China EC Net between 2004 and 2006. In the restitution memo, the prosecution presented similar evidence regarding Patricia M., who gave Lee money in 2004. Therefore Lee's misconduct towards these persons was encompassed within his conviction for securities fraud. Their losses were caused by criminal conduct for which Lee sustained a conviction.

However, Mackie and Greg G. did not invest money to purchase China EC Net shares; instead, they invested $50,000 in one of Lee's investment clubs in 1999. The Attorney General argues they "were not named victims in any of the grand theft . . . charges related to [Lee's] investment clubs, but the financial harm they suffered arose out of the same underlying criminal conduct."

We are not persuaded. First, Lee said he paid back Mackie and Greg G. when he refinanced one of his homes. The restitution memo states: "The People spoke with [Mackie G.] on June 15, 2015. She indicated that her recollection was that Defendant gave her more than the $50,000, however, she indicated that both her brother and father were victims of Mr. Lee's schemes as well, and she split the money with them. Her best recollection was that she retained about $35,000, but she was going to see if she could find documentation. The People have tried to call her again without success and have not heard an update."

Putting to one side the question of whether this statement in the restitution memo constitutes a sufficient factual basis for the restitution award to Mackie and Greg G., we cannot conclude their economic losses, if any, arose out of the conduct underlying Lee's grand theft convictions. Unlike the securities fraud conviction in count 78, Lee's grand theft convictions were victim-specific. For example, Lee's three grand theft convictions related to Sharon H. (counts 31, 33 and 36) were based on Lee's unlawful takings from her in 2005, 2009, and 2011-2012. As Lee puts it, "the conduct underlying . . . [Lee's] convictions was a series of individual acts and misrepresentations, directed at specific persons, by which he obtained funds from them, and he was charged individually for each act." The victim-specific conduct underlying Lee's grand theft convictions could not have caused financial harm to Mackie and Greg G. For this reason, the trial court's order directing Lee to pay restitution to Mackie and Greg G. was unauthorized and must be stricken.

## VI.

### *The Court Operations Assessment and Conviction Assessment Must Be Reduced*

At Lee's sentencing hearing, the trial court imposed a court operations assessment of $3,120 (§ 1465.8, subd. (a)(1)), and a conviction assessment of $2,340 (Govt. Code § 70373, subd. (a)(1)). Lee contends the first fee should be $40 lower, and the second one $30 lower because Lee was convicted of 77 counts, not 78. The Attorney General agrees. Accordingly, the assessments should be lowered by these amounts. In addition, they should be further reduced to reflect our reversal of four money laundering convictions, 20 identity theft convictions, and two elder theft convictions.

21

DISPOSITION

The judgment is affirmed in part, and reversed in part. We reverse the money laundering convictions as charged in counts 68, 69, 72 and 76. We reverse all of the identity theft convictions, i.e., the convictions as charged in counts 4, 7, 10, 13, 17, 20, 24, 28, 29, 32, 35, 38, 44, 47, 49, 52, 55, 59, 62, and 65. We reverse the elder theft convictions as charged in counts 34 and 37. The trial court must modify the restitution order to remove restitution to Mackie and Greg G., and the funds disbursed to them from the trust account should instead be included in the other victims' disbursements. The trial court must reduce the court operations assessment and the conviction assessment to reflect the correct number of Lee's convictions. In all other respects, the judgment is affirmed.

We direct the trial court to prepare an amended abstract of judgment showing these modifications. We order the trial court to send a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

22

_____

Jones, P. J.


We concur:


_____

Needham, J.


_____

Bruiniers, J.


A145038

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>LEWIS ERVING LEE,<br><br>       Defendant and Appellant. | A145038<br><br>(San Mateo County<br>Super. Ct. No. SC080320)<br><br>**ORDER CERTIFYING OPINION<br>FOR PARTIAL PUBLICATION AND<br>MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellant's request for publication, filed April 20, 2017, is granted in part. The opinion, filed on April 4, 2017, is ordered published, with the exception of Discussion parts III, IV, V and VI.

The opinion is modified as follows:

The third paragraph beginning on page 1, line 10, and continuing to page 2, line 4, currently states:

> We affirm in part and reverse in part. We reverse four of the money laundering convictions based on insufficient evidence. We reverse the identity theft convictions because there is no evidence Lee used his victims' personal identifying information for an unlawful purpose without their consent. We reverse two elder theft convictions because the Attorney General concedes there was insufficient evidence to support them. We conclude Lee should not have to pay restitution to one set of victims, and

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion is certified for publication with the exception of parts III, IV, V and VI.

the trial court should amend the judgment to correct the amounts of certain fees.  In all other respects, we affirm.

This paragraph is modified to state:

> We affirm in part and reverse in part.  In the published parts of the opinion, we reverse four of the money laundering convictions based on insufficient evidence, and we reverse the identity theft convictions because there is no evidence Lee used his victims' personal identifying information for an unlawful purpose without their consent.  In the unpublished parts of the opinion, we reverse two elder theft convictions because the Attorney General concedes there was insufficient evidence to support them.  We also conclude Lee is not required to pay restitution to one set of victims.  The trial court shall amend the judgment to correct the amounts of certain fees.  In all other respects, we affirm.

This modification does not change the judgment.


Dated: _____              _____, P. J.

2

The People, v. Lewis Erving Lee (A145038)


Trial Court:    San Mateo County Superior Court

Trial Judge:    Hon. Joseph E. Bergeron

Counsel:

Jeffrey A. Glick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, Lauren Apter, Deputy Attorney General, for Plaintiff and Respondent.